1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   TONY VASQUEZ,                          No.  1:19-cv-00811-DAD-SKO (HC)

12                  Petitioner,             **FINDINGS AND RECOMMENDATION
                                            TO DENY PETITION FOR WRIT OF**
13        v.                                **HABEAS CORPUS**

14   WILLIAM SULLIVAN, Warden,              **[THIRTY DAY OBJECTION DEADLINE]**

15                  Respondent.

16

17        Petitioner is a state prisoner proceeding *pro se* and *in forma pauperis* with a petition for

18   writ of habeas corpus pursuant to 28 U.S.C. § 2254.  He is currently in state prison serving a

19   sentence of life without possibility of parole, plus 64 years to life, plus 27 years, for convictions

20   for, *inter alia*, first degree murder and attempted murder.  The habeas petition presents numerous

21   claims challenging the conviction and sentence. As discussed below, the Court finds the claims to

22   be without merit and recommends the petition be **DENIED.**

23   **I.        PROCEDURAL HISTORY**

24        On January 12, 2015, a Kern County jury found Petitioner guilty of one count of first

25   degree murder (Cal. Penal Code §§ 187(a), 189), one count of attempted murder (Cal. Penal Code

26   §§ 187(a), 664); two counts of shooting at an occupied motor vehicle (Cal. Penal Code 246); one

27   count of illegal firearm possession (Cal. Penal Code 29800(a)(1)); and one count of making

28

                                           1

criminal threats (Cal. Penal Code § 476). (Doc. 19-4 at 157-161.[1])  The jury also found true the special circumstance allegation of discharging a firearm from a motor vehicle at a person outside said vehicle (Cal. Penal Code § 190.2(a)(21)), and the enhancement allegations that Petitioner personally inflicted great bodily injury (Cal. Penal Code §§ 12022.53(d), 12022.7(a)). (Doc. 19-4 at 157-161.)  In a bifurcated proceeding, the trial court found Petitioner had suffered a prior conviction, a prior serious felony conviction, and three prior prison terms pursuant to California's Three Strikes law (Cal. Penal Code §§ 667(b)-(i), 667.5(b), 1170.12). (Doc. 19-4 at 157-161.) The court sentenced him to a prison term of life without the possibility of parole, plus 64 years to life, plus 27 years. (Doc. 19-4 at 157-161.)

Petitioner appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA").  On February 6, 2008, the Fifth DCA affirmed judgment.  People v. Vasquez, No. F071302, 2018 WL 716845 (Cal. Ct. App. 2018).  Petitioner filed a petition for review in the California Supreme Court, and the petition was denied on May 16, 2018. Id.

On June 5, 2019, Petitioner filed a petition for writ of habeas corpus in this Court. (Doc. 1.) Respondent filed an answer on September 6, 2019. (Doc. 18.) On October 9, 2019, Petitioner filed a traverse. (Doc. 20.)

## II.     FACTUAL BACKGROUND

The Court adopts the Statement of Facts in the Fifth DCA's unpublished decision[2]:

> In the small hours of April 10, 2014, Armando Ortiz and Aaron Rocha were brought to the emergency department at Kern Medical Center in Bakersfield. Ortiz had sustained a gunshot wound to the right temple, was "in extremis," and "ultimately went into cardiac arrest." The medical staff administered cardiopulmonary resuscitation, medication, and defibrillation, but to no avail. Ortiz was pronounced dead at 1:52 a.m. On the other hand, Rocha, who had sustained a gunshot wound to the right proximal superior lateral thigh, was discharged at 5:40 a.m. after receiving treatment.
>
> During Ortiz's autopsy, the forensic pathologist extracted a projectile that was consistent with a bullet caliber in the nine-millimeter range.

---

[1] Citations are to ECF pagination.

[2] The Fifth DCA's summary of facts in its unpublished opinion is presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1). Therefore, the Court will rely on the Fifth DCA's summary of the facts.  Moses v. Payne, 555 F.3d 742, 746 (9th Cir. 2009).

## I. Prosecution's case-in-chief.

### a. Aaron Rocha.

Sometime in March 2014, Rocha borrowed a black four-door 2011 Honda Accord with a red Dynasty Motors paper plate from his friend Studer [Fn.5] to visit his children. After returning from his trip, Rocha learned Studer "went to ... rehab" and "didn't want anybody to know where he was at." Rocha attempted to locate Studer for almost two weeks without success. He decided to keep the Honda Accord until Studer resurfaced.

[Fn.5] Rocha did not know Studer's actual name.

At some point, Rocha loaned the Honda Accord to Shelly McKeen for a few hours, but she "never brought it back." McKeen initially told Rocha law enforcement had thrown her in jail and confiscated the car because it was stolen. She subsequently admitted she had given the car to someone named "Tony Vasquez or Velasquez" to pay off a debt. McKeen brought Rocha to "Tony's" house on 6812 Zelda Way, where the Honda Accord was parked on the front lawn and a silver two-door Saturn was parked on the driveway. Several individuals stood outside the residence. They went into the garage when Rocha approached them. He assured the group he "didn't want no problems" and "just wanted the keys" to the Honda Accord. Rocha asked for "Tony" but was advised the latter "wasn't home." He saw an outdoor surveillance camera aimed at the driveway and "knew they could see [him]." Rocha also noticed there were keys in the Saturn's ignition switch. In front of the camera, he announced, "I'm gonna take that car and when you bring me my car, tell him I'll give him his." Rocha drove away in the Saturn. When he passed by "Tony's" house 15 minutes later, the Honda Accord was gone.

Rocha obtained "Tony's" cell phone number from McKeen. He contacted him and the two men agreed to meet in person and swap cars. "Tony," however, never appeared at the designated location. At some point, McKeen informed Rocha that "Tony" "had a monitor" and "had to be ... home at 10:00."

On April 4, 2014, at or around noontime, Rocha was driving the Saturn when he saw the Honda Accord on Pacheco Road. He followed it to the intersection of Pacheco Road and South Union Avenue. When Rocha pulled up alongside the Honda Accord, the driver of the Honda Accord opened fire, damaging the Saturn's passenger side door and window, and took off. The gunman appeared to be an elderly Hispanic male with a "heavy mustache" and "big goatee."

On April 10, 2014, sometime after midnight, Rocha drove the Saturn to a 7–Eleven convenience store on the corner of Pacheco Road and South H Street to purchase gas and beer. He was accompanied by his friend Ortiz, who possessed a revolver and placed it in the center console. Rocha parked the Saturn next to a pump and went into the store to pay for the gas. At some point, Rocha and Ortiz agreed to switch seats because Rocha "was gonna drink" and "didn't want to drive." After refueling the Saturn, Rocha sat in the front passenger seat and began counting the change to determine whether there was enough money to buy beer. Suddenly, he heard a gunshot. Rocha glanced over his right shoulder and saw the gunman in the driver's seat of the Honda Accord. He dived into the backseat but was struck in the right thigh. Rocha shouted, "Let's go, let's go," but the Saturn remained stationary. He looked at Ortiz in the driver's seat and realized Ortiz had been shot in the head. Fearing the gunman was still nearby, Rocha grabbed the revolver and fled. However, he decided to return to 7–Eleven because he "didn't do anything wrong." After

3

confirming the gunman was no longer in the vicinity, Rocha tossed the revolver into the bushes because he "wasn't gonna carry the gun inside the store" and called 911. Shortly thereafter, he told officers who arrived on the scene the gunman was a Hispanic male with a beanie and goatee in a black car.

At Kern Medical Center, Rocha spoke with Officer Escobedo and then Detective Moore. Both times, he reiterated the 7–Eleven gunman was a Hispanic male with a beanie and goatee. During the interview with Moore, Rocha added the gunman was driving a black Honda Accord and appeared "younger than the guy that was on Union and Pacheco." He denied having any acquaintance with the vehicle. Rocha also denied possessing a gun at the scene but subsequently admitted taking Ortiz's gun.

Six hours after being discharged from the hospital, Rocha spoke with Moore at the Bakersfield Police Department. There, Moore stated he knew the 7–Eleven shooting was related to Rocha's conflict with "a dude" over the Honda Accord. He revealed "the guy" wore an ankle monitor and Global Positioning System (GPS) data from the monitor placed "the guy" at 7–Eleven "exactly when [Rocha] was shot." Moore then asked, "Do you know Tony's last name?" Rocha answered, "Velasquez or Vasquez." Believing Rocha and defendant "had a relationship" and "knew each other," Moore showed Rocha a photograph of defendant and asked, "Is this the guy that shot you?" Rocha promptly replied, "Yeah, if you put a beanie on him." Later in the interview, Rocha denied hiding heroin in the Honda Accord and owning a firearm. When Moore pointed out a witness saw him stash a gun in the bushes, Rocha answered, "Okay, yeah there was a gun but it wasn't mine."

On April 11, 2014, Rocha entered the state witness protection program. In exchange, he agreed in writing to obey all laws and testify truthfully in court. On June 27, 2014, Rocha was detained by the United States Border Patrol due to an expired visa. In early July 2014, he was transferred to the county detention facility in Lerdo, ending his involvement in the program.

At trial, Rocha was unable to identify defendant as the 7–Eleven gunman, citing poor memory and trauma. Regarding the April 10, 2014, interview with Moore, he remarked, "I just felt a little pressure like to say because of the monitor evidence and the black car, I felt I was being pressured and by saying it is [defendant] when [Moore] pointed the finger at the picture."

 *b. Witnesses and law enforcement at or near 7–Eleven at the time of the shooting.*

On April 10, 2014, at or around 12:15 a.m., Rodrigo D. and his girlfriend were renting a movie from a Redbox kiosk in front of 7–Eleven when he heard four or five gunshots. Rodrigo then saw a black four-door sedan with tinted windows leaving the parking lot. The sedan "looked shiny" and "brand new." Rodrigo and his girlfriend entered the store and called 911. Seconds later, "one of the individuals who had been shot" entered the store and "[got] on the phone."

At 12:17 a.m., Bridget C. called 911 and told the dispatcher she heard three to four gunshots "coming just north of [her] apartment." At trial, she specified her apartment was "[j]ust south" of 7–eleven.

Sometime before 12:20 a.m., Officer McCauley was on duty near the intersection of Pacheco Road and Monitor Street when he heard about five gunshots west of his location. He and his partner drove westbound on Pacheco Road in the direction of

the gunfire. They were informed about a shooting at 7–Eleven en route. [Fn.6]

> [Fn.6] At trial, McCauley testified he executed a search warrant at 6812 Zelda Way on September 4, 2013, and confirmed defendant inhabited the master bedroom. He added the outdoor surveillance camera connected to a monitor in that bedroom.

At or around 12:20 a.m., Officers Barajas and Billdt were dispatched to 7–Eleven. There, they spotted Rocha limping in front of the entrance and Ortiz sitting motionless in the driver's seat of the Saturn. Billdt, a licensed paramedic, extricated Ortiz from the vehicle. He observed profuse bleeding from Ortiz's nose and right ear indicative of a skull fracture. Billdt supplied medical aid until the ambulance arrived.

Meanwhile, Barajas found three Winchester nine-millimeter Luger shell casings next to the Saturn. With the help of an anonymous witness, he recovered an H & R model 922 .22–caliber nine-shot revolver in the bushes adjacent to the parking lot. The witness told Barajas "one of the occupants of the Saturn was the person that hid that gun." Subsequent forensic analysis established the shell casings were expelled from a semiautomatic handgun, not the revolver.

*c. GPS data from defendant's ankle monitor.*

On November 5, 2013, defendant, a "gang-affiliated parolee[ ]," was placed under the supervision of parole agent Miller and fitted with an ankle monitor. On April 1, 2014, at 4:52 p.m., as part of a mandatory weekly check-in, he reported to Miller at the parole office. After defendant exited the office past 5:00 p.m., Miller surveyed the parking lot and saw only a black four-door Honda Accord. As defendant approached the driver's side of the vehicle, Miller, whose view was partially obscured "by one of the support columns of the building up front," "moved around to get a different vantage point." By the time Miller repositioned himself, defendant was nowhere in sight and the Honda Accord was leaving the lot. GPS data from defendant's monitor showed defendant traveling at 27 miles per hour at 5:09 p.m.

On April 9, 2014, GPS data from the monitor showed defendant leaving 2001 Custer Avenue, his reported address, and traveling at 15 miles per hour at 11:45 p.m. His speed increased to 31 miles per hour at 11:54 p.m. On April 10, 2014, at 12:02 a.m., defendant stopped at the southwest corner of South H Street and Brundage Lane, the site of an ampm convenience store. He stayed there until 12:09 a.m. At 12:12 a.m., defendant traveled southbound on South H Street at 38 miles per hour. At 12:16 a.m., he stopped at the southwest corner of Pacheco Road and South H Street, the site of the 7–Eleven.

Between 12:18 and 12:37 a.m., GPS data from the monitor showed defendant "zigzagging across ... streets" and "staying up in the yards" in the residential neighborhood northeast of 7–Eleven. At trial, Miller deduced defendant was on foot during this period "[b]ased on the location, the geography, [the] barriers and [defendant's] speed." Defendant then crossed White Lane, stopped and waited at Ivan Avenue, and departed "at a speed ... suggest[ing] that he's ... back in a vehicle." He returned to 2001 Custer Avenue at or around 1:37 a.m.

At 1:52 a.m., GPS data from the monitor placed defendant at the intersection of East Brundage Lane and Weedpatch Highway near a Denny's restaurant. He left the area at 2:29 a.m. and traveled westbound on East Brundage Lane. At 3:50 a.m., defendant was on South Oswell Street. At 3:55 a.m., defendant removed the monitor. Miller received a tamper alert and traced the device to La Posta Street.

### d. Surveillance footage.

Surveillance footage recorded at ampm on April 10, 2014, showed (1) a black car pulling up next to a gas pump at 12:02 a.m.; (2) a female entering the store at 12:03 a.m.; (3) a male wearing black and white shoes next to the black car at 12:04 a.m.; and (4) the black car leaving at 12:09 a.m. At trial, Moore reviewed the footage and opined the black car "was consistent with [the] black Honda that had been in dispute between [Rocha and defendant]." He also identified the female as Melanie Dunn, describing her as "part employee, part girlfriend, part crime partner with [defendant]."

Surveillance footage recorded at 7–Eleven on April 10, 2014, showed (1) Rocha entering the store at 12:11 a.m., paying for gas, and exiting at 12:12 a.m.; (2) three gunshots being fired outside the store at 12:16 a.m.; (3) Rodrigo and his girlfriend entering the store at 12:16 a.m. and calling 911; and (4) Rocha entering the store with his cell phone at 12:18 a.m., exiting temporarily, entering again at 12:19 a.m., and exiting again at 12:20 a.m.

Surveillance footage recorded at Denny's on April 10, 2014, showed (1) a male wearing black and white shoes and a female in the parking lot next to a sports utility vehicle (SUV) at 2:04 a.m.; (2) the male and female entering the restaurant at 2:05 a.m.; (3) the male and female leaving the restaurant at 2:23 a.m.; (4) the male and female next to the SUV at 2:24 a.m.; and (5) the SUV leaving the parking lot at 2:27 a.m. At trial, Moore reviewed the footage and identified the male as defendant and the female as Dunn. He pointed out "the shoes [defendant]'s wearing on the Denny's video that was after the shooting are consistent with the shoes worn by the [male] at the *ampm* on Brundage and H."

### e. Defendant's arrest and interview.

On April 10, 2014, at or around noontime, in the parking lot of America's Best Inn near the intersection of East Brundage Lane and Weedpatch Highway, officers spotted defendant sitting in the front passenger seat of a silver 1998 Toyota 4Runner. Defendant exited the vehicle and "immediately walked in a northbound direction" "at a fast pace" toward a gas station. He "kept looking back" "nervously over his shoulder." Defendant approached a customer who was refueling a red Ford Explorer. The two entered the Ford Explorer, the customer in the driver's seat and defendant in the front passenger seat, and departed. Officers pulled over the vehicle, which, at that moment, "appeared to be ... occupied by the driver and driver only." After the driver complied with commands to vacate the Ford Explorer, officers ordered "other passengers" "to get out." Defendant emerged from the front passenger door and was detained. At the time of his arrest, he had a goatee. [Fn.7]

> [Fn.7] Meanwhile, officers found Dunn, another man, and a glass methamphetamine pipe in one of the rooms at America's Best Value Inn.

At approximately 8:35 p.m., following a recitation of the *Miranda* [Fn.8] warning, Moore interviewed defendant at the Bakersfield Police Department. Defendant acknowledged he used to live at a residence on Zelda Way for a "long time," but his current living situation was "up in the air." He denied having acquaintance with a black Honda Accord.

> [Fn.8] *Miranda v. Arizona* (1966) 384 U.S. 436.

6

*f. Subsequent searches.*

At the time of his arrest, officers seized defendant's wallet, cell phone, and glass methamphetamine pipe. The wallet contained the state identification card of a man named Roop Sandhu. The cell phone contained Rocha's and McKeen's phone numbers.

Several videos were extracted from the cell phone. One video, which was about 13 minutes in length and marked and received into evidence as People's Exhibit No. 8–A, featured a conversation between a female and a male in which another male interjected intermittently. For the majority of the video, which was filmed by the female, due to the placement of the camera, the faces of the speakers could not be seen. Later, the female repositioned the camera, which showed (1) a male wearing a red hooded sweatshirt in a residential garage; and (2) a male wearing a white tank top in a bedroom. The footage established the conversation was primarily between the female and the male wearing the red hooded sweatshirt, the latter of whom sounded distraught. The male wearing the white tank top did not appear in the footage until after the female left the male wearing the red hooded sweatshirt in the garage. At trial, Moore watched People's Exhibit No. 8–A. He identified the male in the red hooded sweatshirt as Sandhu, the male in the white tank top as defendant, and the female voice as belonging to defendant's wife Melissa Vasquez. [Fn.9] Moore testified he could recognize Melissa's voice because he had spoken or listened to her numerous times.[3]

> [Fn.9] The record refers to defendant's wife as either Melissa Vasquez or Melissa Cornelius. To avoid confusion, we simply refer to her as Melissa.

Another video, which was about 10 minutes in length and marked and received into evidence as People's Exhibit No. 9–A, featured a conversation between a male and female inside a moving vehicle at nighttime. During the conversation, the female sounded distressed. Due to the darkness as well as the placement of the camera, the faces of the speakers could not be seen. At trial, Moore watched People's Exhibit No. 9–A. He identified the male voice as belonging to defendant and the female voice as belonging to Dunn. Moore testified he could recognize their voices because he had spoken or listened to them numerous times.[4]

On April 10, 2014, at approximately 8:35 p.m., officers executed a search warrant at 2001 Custer Avenue. They found a red Dynasty Motors paper plate on a hallway countertop; photographs of defendant; a "Notice to Appear" bearing defendant's name; a utility bill addressed to defendant; and a "Probable Cause Determination" listing 6812 Zelda Way as defendant's "last known address." (Boldface & some capitalization omitted.)

*g. Gang expert.*

Officer Beagley, the prosecution's gang expert, testified the Varrio Bakers are a criminal street gang in Bakersfield with "well over several hundred" members, most of whom are Hispanic. They claim as their "turf" the area of the city bordered by Truxtun Avenue to the north, Eye Street to the west, Brundage Lane to the south, and either Dr. Martin Luther King Boulevard or Washington Street to the east. Their

---

[3] For the sake of brevity, the Court will not recite the transcript of the video. The full transcript can be found in the documents lodged by Respondent. (Doc. 19-5 at 56-70.)

[4] Here as well, the Court has excluded recitation of the transcript of the video. (Doc. 19-5 at 6-17.)

primary activities include murder, assault with a deadly weapon, illegal firearm possession, robbery, carjacking, automobile theft, drug sales, and vandalism. Varrio Bakers members have been convicted of assault with a deadly weapon, assault with a firearm, illegal firearm possession, robbery, transportation of controlled substances, and gang participation.

To identify themselves, Varrio Bakers sport tattoos of the name of the gang and/or abbreviations thereof, e.g., "V" (for Varrio) and "VB," "VBKS," and "VE BE" (for Varrio Bakers). In addition, because Bakersfield is south of Delano, the "cutoff line" "separat[ing] Northern and Southern California," Varrio Bakers are affiliated with the Sureños and the Mexican Mafia. Hence, Varrio Bakers adopt symbols associated with the Sureños and the Mexican Mafia, including the color blue, the word "sur" (for Sureños), the letter "M" (for Mexican Mafia), and the number "13" signifying the 13th letter of the alphabet "M" (for Mexican Mafia).

According to Beagley, "[r]espect amongst Varrio Bakers" is "huge." He detailed:

> "The one who is putting in the most work, the one who is active is going to be more respected and be a higher rank. He's also going to be respected and feared by ... the rival gangs. [¶] ... [¶] ... It also goes to citizens. You know, why put VB on your face? Why put VB on the back of your head? They demand respect. They think you'll respect them if they have these scary tattoos on their head or their face. [¶] ... [¶] ... [Something] that comes to mind is a conversation ... with ... Dominick Pena[, a Varrio Baker].... I asked him what he would do, basically, if he was disrespected. He said depending on the level of disrespect, he may give them an ass-whipping or he may kill them, depending on how bad he was disrespected."

Beagley watched People's Exhibit No. 8–A, the conversation between Melissa and Sandhu, and verified the filming took place in the garage of 6812 Zelda Way. He remarked:

> "I found it significant that [defendant's] wife, girlfriend, whatever, she was the one doing the—basically the interview of ... Sandhu. He was terrified out of his mind and basically he was talking about how he messed up and he didn't do what he was supposed to do....
>
> "Tony was having him do crimes for him, so he didn't have to do them himself. He was using somebody, basically a weak-minded individual to do some crimes for him. He was crying about it and was very scared of Tony. He was terrified. After the video was done, it shows Tony asking Melissa, hey, did you get that, did you get that?"

With regard to Sandhu's comments about "never bring[ing] ... pigs to [defendant's] house," Beagley noted the repercussions of "snitching" in the context of gang culture:

> "[S]nitching is basically tattling, tattle-telling, telling on each other for crimes that have been committed. Snitching is frowned upon within gang culture.... [¶] ... [¶] ... [I]t could cost them their life. It could cause them to be beat up, which is why we go out of our way to make sure that doesn't happen when we work with informants. We don't want them to be found out."

Beagley watched People's Exhibit No. 9–A, the conversation between defendant and

8

Dunn. He remarked:

> "I talked about how respect is a big part of gang culture and gang lifestyle. In the video [defendant] tells ... Dunn—I remember him saying straight-up disrespect, then he talked about basically, you know, if I let you get away with this, then the next one is going to try to get away with it.

> "I found that very significant. It goes along the lines of respect of him and demanding respect. And videotaping the deal of this, of ... Dunn basically terrified out of her mind, he's recording this incident basically to show that he's a bad dude. He's a scary guy. He makes people cry.

> "He can show other people this video of how bad of a guy he is."

Based on police reports, photographs, and discussions with other officers, Beagley opined defendant was a Varrio Baker at the time of the 7–Eleven shooting. When he was arrested, defendant was wearing blue attire. His body was covered with numerous gang-related tattoos, including the initials "VB" on his head and lower thigh; the word "SUR" on his chest; the word "Baker" across his stomach; and the Roman numeral "X" on his right arm and the number "3" on his left arm, forming the number "13." Defendant was charged with murder, inter alia, one of the gang's primary activities. In a 1995 interview with a detective, defendant admitted committing grand theft auto more than 10 times with two other Varrio Bakers members. In 2001, officers obtained photographs of defendant "throwing up the V [sign]" for "Varrio Bakers" with either his hand or elbows. During a 2001 traffic stop of defendant's vehicle, officers found two loaded firearms, a significant amount of methamphetamine, and a photograph of defendant with another Varrio Bakers member. In 2007, officers searched defendant's residence at 1115 Sandra Drive and found two loaded firearms, an ounce of methamphetamine, and a belt buckle bearing the letter "V" for "Varrio," leading to his arrest for selling drugs and illegally possessing firearms. During a 2012 traffic stop of defendant's vehicle, officers found $1,200 and 12 grams of "bunk dope," leading to his arrest for selling drugs. Defendant then admitted being an active Varrio Baker and associating with other Varrio Bakers. In 2013, officers searched defendant's residence at 6812 Zelda Way and found a loaded firearm and a large letter "V" spray-painted on the garage floor. Defendant claimed he "wasn't active because he was damn near 40" but acknowledged he had not "dropped out" of the gang.

The prosecutor asked hypothetically whether a Varrio Baker would feel disrespected "if someone were to go up to ... [his] house and demand[ ] a car that is located at the house, then being unable to get it, steal[ ] a car that's on the property of the house and ... specifically intend[ ] to make a scene for video[ ]cameras that are associated with the house...." Beagley responded:

> "Absolutely. [¶] ... [¶] ... I think it's one thing to disrespect a Varrio Baker out in the street or out in the hood but it's another thing to come to his house, where his wife can live in, his kids can live in, his mom, and disrespect him severely. I mean, taking a car from his house; that's where he lives. That's where his family is at. That's total disrespect. [¶] ... [¶]

> "... [H]e's going to retaliate. He's going to retaliate severely. He may severely beat up the subject who did it. He may stab him. He may shoot him, kill him."

The prosecutor then asked how the Varrio Bakers benefit when the "Varrio Baker

9

gang member who has someone come to his house and ... steal[ ] a car from the house" "[comes] into contact with the stolen vehicle" and "fire[s] shots at the vehicle and its occupants upon seeing it." Beagley responded:

> "Some of the benefits would be, basically, we're talking about respect. By coming to a Varrio Bakers' house where his wife could live, his kids could live, and taking that car, even though there are cameras present, making a scene, would be very disrespectful to that Varrio Bakers gang member.

> "By him retaliating upon seizing his vehicle, and retaliating, basically he was disrespected. He's trying to gain that respect back. He's basically getting respect. On the benefit of the Varrio Bakers, basically it's showing that when somebody disrespects one of its members, they take care of business. They go as far, even, to shoot and kill someone who even took some property from their house.

> "It shows that the gang itself is a violent gang. It sends a message to the rival gangs. It sends a message to the citizens of Bakersfield that Varrio Bakers aren't to be messed with. I think it also raises the status of that Varrio Baker within his gang that he's a shooter. He's a killer. He would be somebody that would have some influence on the gang. [¶] ... [¶]

> "... I think the fact that the passenger also was shot and killed in the vehicle, basically that goes to show that if you disrespect a Varrio Baker, not only is your life in danger, it could be somebody you're with. It could be your mom, a child. No one is safe around you once you commit that level of disrespect against a member of the Varrio Bakers. [¶] ... [¶]

> "... [I]t strikes fear into the community. I've talked about some different times where citizens were victimized by Varrio Bakers. It may prevent citizens who are victimized in the future—they may not cooperate. They'll give them their property. They won't fight back.

> "If they witness a crime, they may not want to testify because they know what the Varrio Bakers gang members are capable of."

## II. Defense's case-in-chief.

### a. Jazmine Barron.

Barron lived with Rocha in November 2013. He used and sold drugs and "always" carried a gun "because he had a lot of problems." Rocha also possessed a "bad temper" and threatened others with the gun "when it wasn't his way." At trial, Barron viewed a photograph of the revolver retrieved from bushes adjacent to 7–Eleven's parking lot on the night of the shooting and testified it belonged to Rocha.

In early 2014, Rocha told Barron he "was coming back from Baja, California" or "Calexico" with a black Honda containing heroin. Later, he mentioned he gave the car to McKeen "to get what he wanted from her," but she "sold the car" without telling him.

Barron first met defendant "when [she] was running around in the streets homeless" and considered him "a friend." She has "never seen him get violent." Barron also knew Dunn, describing her as someone who "was always there" and "would do anything and everything she can just to be with [defendant]."

10

1

*b. Heather Stewart.*

Stewart dated Rocha's roommate and lived with the men in September and October 2013. At the outset, she thought Rocha was "an okay guy." However, Stewart later discovered he was abusive towards women. One time, Rocha showed her his gun, which he named "bitch" and "always" "carried ... with him." It was "dark in color," "very heavy," and "had a long barrel." At trial, Stewart viewed a photograph of the revolver retrieved from bushes adjacent to 7–Eleven's parking lot on the night of the shooting and testified Rocha's gun "looked like that."

Stewart knew defendant and considered him a friend. She was at his house when "a girl had brought [him]" a black Honda. Subsequently, Stewart learned from Rocha the Honda belonged to him and he stole defendant's Saturn in turn. He also revealed the vehicle contained two pounds of heroin and he "was late on a deal where he was supposed to drop that car off," putting his life at risk. Stewart told Rocha she knew defendant and was willing to facilitate a trade. She phoned defendant and arranged a swap. When Stewart went to defendant's house, however, defendant and his family had already moved out.

*Vasquez*, 2018 WL 716845, at *2–16 .

## III.  DISCUSSION

### A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n. 7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the United States Constitution.  The challenged conviction arises out of the Kern County Superior Court, which is located within the jurisdiction of this court.  28 U.S.C. § 2254(a); 28 U.S.C.§ 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment.  Lindh v. Murphy, 521 U.S. 320 (1997) (holding the AEDPA only applicable to cases filed after statute's enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

### B.  Legal Standard of Review

A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the petitioner can show that the state court's adjudication of his claim: (1) resulted in a decision

that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>Lockyer v. Andrade</u>, 538 U.S. 63, 70-71 (2003); <u>Williams</u>, 529 U.S. at 412-413.

A state court decision is "contrary to" clearly established federal law "if it applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." <u>Brown v. Payton</u>, 544 U.S. 133, 141 (2005) (citing <u>Williams</u>, 529 U.S. at 405-406).

In <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. The Supreme Court has "said time and again that 'an unreasonable application of federal law is different from an incorrect application of federal law.'" <u>Cullen v. Pinholster</u>, 563 U.S. 170, 203 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

The second prong pertains to state court decisions based on factual findings. <u>Davis v. Woodford</u>, 384 F.3d 628, 637 (9th Cir. 2003) (citing <u>Miller-El v. Cockrell</u>, 537 U.S. 322 (2003)). Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Wiggins v. Smith</u>, 539 U.S. 510, 520 (2003); <u>Jeffries v. Wood</u>, 114 F.3d 1484, 1500 (9th Cir. 1997). A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." <u>Jeffries</u>, 114 F.3d at 1500; <u>see</u> <u>Taylor v. Maddox</u>, 366 F.3d 992, 999-1001 (9th Cir. 2004), <i>cert.denied</i>, <u>Maddox v. Taylor</u>, 543 U.S. 1038 (2004).

To determine whether habeas relief is available under § 2254(d), the federal court looks to the last reasoned state court decision as the basis of the state court's decision.  See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004).  "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions."  Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007) (holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).

C.      Review of Petition

Petitioner raises ten claims in his petition: 1) The pretrial identification of Petitioner was unduly suggestive and unnecessary in violation of his due process rights; 2) The trial court failed to instruct on self-defense and imperfect self-defense in violation of Petitioner's due process rights; 3) Defense counsel was ineffective in failing to request instruction on perfect and imperfect self-defense; 4) Petitioner was denied due process by the admission of prejudicial gang evidence and by the instruction that permitted the jury to consider gang evidence on the issue of motive; 5) Petitioner was denied due process by the admission of prejudicial video evidence that served no other purpose than to show his evil character to establish a probability of his guilt; 6) The prosecutor committed misconduct by arguing facts not in evidence; 7) The trial court erred by excluding admissible hearsay of a witness thereby denying Petitioner his right to present a complete defense; 8) Petitioner was wrongly given an elevated sentence for attempted murder without a proper jury finding that the crime was willful, deliberate and premeditated as required by Apprendi; 9) The conviction for criminal threats was unsupported by substantial evidence showing a true threat within the meaning of Cal. Penal Code § 422; and 10) The cumulative impact of the series of trial errors denied Petitioner his right to a fair trial.

1.  Pretrial Identification

Petitioner first claims the trial court erred in admitting a pretrial identification because the

13

identification procedure was unduly suggestive and unnecessary.  Petitioner raised this claim on direct review.  In the last reasoned decision, the Fifth DCA denied the claim as follows:

> *a. Background.*
>
> At the June 2014 preliminary hearing, Rocha testified he was "70 percent" certain that defendant was the 7–Eleven gunman.
>
> Defendant moved in limine to "[e]xclude testimony or evidence of a photo lineup as unduly suggestive." (Boldface omitted.) The prosecutor opposed the motion. Thereafter, the court conducted a hearing pursuant to Evidence Code section 402.
>
> Defense investigator Mattson testified she interviewed Rocha in county jail on September 4, 2014. When asked whether he "was able to get a look at the person who fired the shots" at 7–Eleven, Rocha said he "didn't see" the gunman and "just saw that he had a beanie." Concerning the interview at the Bakersfield Police Department, during which he was shown defendant's photograph, Rocha recounted "the officer kept pointing at the picture" and "told him that they had [defendant] on an ankle monitor in that area." Rocha told Mattson "something about feeling pressured ... to say it was [defendant]." He further disclosed he "spoke to someone from the D.A.'s office about the case." Rocha was "promised ... the moon and stars" "if he identified [defendant] as the shooter" but "threatened ... with jail if he [did] not say it was [defendant]." Finally, he told Mattson he "made an assumption based on the dark-colored car," "made an assumption that it was [defendant] because he had bad history with him," "didn't know for sure that that was the car," and "did not see who the shooter was."
>
> Rocha testified he did not "remember much" about the 7–Eleven shooting. He recalled being in the passenger seat when he heard a gunshot. Rocha "barely looked," saw a black car, and "threw [himself] in between the seats." He emphasized, "[A]ll I saw was a guy with a beanie and goatee, the black car." During an interview with a detective at the Bakersfield Police Department, Rocha was shown "a lot of pictures." The detective "mentioned something about [a] monitor that went off at [the] time of the crime," "pointed [at a] picture" of defendant, and "asked ... if [defendant] was the person." Rocha, who had "never seen [defendant] before," "[felt] pressure when [the detective] point[ed] the finger and ask[ed] ... 'Is this the person?' " and answered, "[M]aybe."
>
> On cross-examination, Rocha testified his memory of the 7–Eleven shooting was not "better ... the day that it happened than it [was] ... eight months later." He "[didn't] think" he phoned 911 immediately after the shooting but acknowledged doing so after he heard a recording of his 911 call, in which he described the gunman's vehicle as a black Honda Accord. Rocha then heard recordings of his subsequent interviews with officers and acknowledged telling them the gunman was a Hispanic male with a beanie and goatee and he "saw [the gunman's] face." He also acknowledged saying, "If I see him, I'll know him." With regard to his interaction with the district attorney's office, Rocha conceded he was never "specifically told that [he] had to identify [defendant]" and was "repeatedly told that the only thing ... expect[ed] from [him] [was] the truth."
>
> Moore testified he first interviewed Rocha at Kern Medical Center. There, Rocha verified the 7–Eleven gunman drove a black Honda and stated he "saw the driver very well." He also expressed "wanting to get his daughter out of town before he started saying names." Afterward, Moore "received information from multiple

sources" about an "ongoing feud" between Rocha and defendant "regarding the black Honda," contacted Miller, and confirmed the GPS data from defendant's ankle monitor placing defendant at 7–Eleven at the time of the shooting. During the interview with Rocha at the Bakersfield Police Department, without mentioning defendant's name, Moore told Rocha "that the guy that he was in a dispute with over the car, his GPS had put him at the 7–Eleven gas station at the time of the shooting." Moore divulged this information because he "wanted [Rocha] to feel comfortable that we were going to protect him the best we could." Later, Moore showed Rocha a photograph of defendant and asked, "Is this the guy that shot you?" Rocha responded in the affirmative. As to why he showed Rocha defendant's photograph, Moore explained:

> "I had multiple reasons. One of the main ones is it was apparent to me that the two men had a relationship, and that ... Rocha knew [defendant]. [¶] And I was confirming that the Tony Vasquez that I believed it was was the same Tony Vasquez that he was talking about.

> "The other reason is we were actively looking for [defendant], and I also wanted to make sure that this was the right person that we were talking about and not some other relative or unknown Tony Vasquez."

The court admitted Rocha's pretrial identification testimony:

> "In regard to showing [Rocha] the one photograph which Detective Moore showed, in regard to that, I do believe that that was unduly suggestive and unnecessary. [¶] ... [¶]

> "Given the totality of the circumstances of the numerous statements made by [Rocha] before and also during the time that the photograph was shown, there is a level of certainty that would allow this information to be provided to the jury by way of testimony."

b. *Analysis*.

"A claim that an identification procedure was unduly suggestive raises a mixed question of law and fact to which we apply a standard of independent review, although we review the determination of historical facts regarding the procedure under a deferential standard." (*People v. Clark* (2016) 63 Cal.4th 522, 556–557.)

"In order to determine whether the admission of identification evidence violates a defendant's right to due process of law, we consider (1) whether the identification procedure was unduly suggestive and unnecessary, and, if so, (2) whether the identification itself was nevertheless reliable under the totality of the circumstances, taking into account such factors as the opportunity of the witness to view the suspect at the time of the offense, the witness's degree of attention at the time of the offense, the accuracy of his or her prior description of the suspect, the level of certainty demonstrated at the time of the identification, and the lapse of time between the offense and the identification." (*People v. Cunningham* (2001) 25 Cal.4th 926, 989.) "Moreover, there must be a 'substantial likelihood of irreparable misidentification' under the ""'totality of the circumstances'"" to warrant reversal of a conviction on this ground." (*Id*. at p. 990.)

Assuming, arguendo, Rocha's pretrial identification testimony was obtained through an impermissibly suggestive procedure, in view of the totality of the circumstances, we find no substantial likelihood of irreparable misidentification. The record shows

Rocha loaned his friend's black four-door 2011 Honda Accord with a red Dynasty Motors paper plate to McKeen, who, in turn, sold the car to someone named "Tony Vasquez or Velasquez." She brought Rocha to 6812 Zelda Way, one of defendant's known addresses, where the Honda Accord was parked on the front lawn. Individuals standing outside the residence told Rocha that "Tony" "wasn't home." After Rocha took the Saturn from 6812 Zelda Way, he obtained "Tony's" cell phone number from McKeen and contacted him to set up an exchange. Following defendant's arrest, officers seized defendant's cell phone, which contained Rocha's and McKeen's phone numbers. Officers later searched 2001 Custer Avenue, another of defendant's known addresses, and found a detached red Dynasty Motors paper plate, inter alia. Miller's testimony further verified defendant possessed a black Honda Accord more than a week before the 7–Eleven shooting.

On the morning of the 7–Eleven shooting, although Rocha glanced momentarily at the gunman, he nonetheless was able to discern the gunman was a Hispanic male with a beanie and goatee in the driver's seat of the Honda Accord. Rodrigo, a percipient witness, saw a black four-door sedan. Within minutes of the shooting, Rocha (1) phoned 911 and identified the gunman's vehicle as a black Honda Accord; and (2) told officers who arrived on the scene the gunman was a Hispanic male with a beanie and goatee in a black car. In subsequent interviews with officers at Kern Medical Center, he reiterated the gunman was a Hispanic male with a beanie and goatee, adding he "saw [the gunman's] face" and could identify him "[i]f [he] s[aw] him" again. (Cf. *People v. Kennedy* (2005) 36 Cal.4th 595, 611 [length of time between crime and identification "only three weeks"], disapproved in part by *People v. Williams* (2010) 49 Cal.4th 405, 459.)

Over 11 hours after the shooting and six hours after being discharged from the hospital, Rocha spoke with Moore at the Bakersfield Police Department. Before Moore displayed defendant's photograph, he told Rocha "the guy who[m] [Rocha] had conflict with" over the Honda Accord wore an ankle monitor and the GPS data from that monitor placed "the guy" at 7–Eleven at the time of the shooting. According to Rocha, he already knew "the guy," i.e., Tony Vasquez or Velasquez, "had a monitor." When he was shown defendant's photograph and asked whether defendant was the gunman, Rocha promptly answered, "Yeah, if you put a beanie on him." At the preliminary hearing, Rocha testified he was "70 percent" certain that defendant was the gunman.

GPS data from defendant's ankle monitor confirmed (1) defendant was at 7–Eleven at the exact time the shooting occurred; and (2) defendant fled from 7–Eleven on foot immediately after the shooting occurred. GPS data also placed defendant at ampm a few minutes before the shooting and at a Denny's restaurant more than two hours after the shooting; concurrent surveillance footage recorded at these establishments corroborated the data. In particular, ampm's footage captured defendant alongside a black car. (See *People v. McGriff* (1984) 158 Cal.App.3d 1151, 1157 ["Although evidence against appellant was largely circumstantial, the circumstantial evidence was overwhelming."].)

Vasquez, 2018 WL 716845, at *19-21.

### a. *Legal Standard*

Due process prohibits the admission of eyewitness identifications obtained after police have arranged identification procedures so impermissibly suggestive as to give rise to a "'very

16

substantial likelihood of irreparable misidentification.'" <u>Perry v. New Hampshire</u>, 565 U.S. 228, 232 (2012) (quoting <u>Simmons v. United States</u>, 390 U.S. 377, 384 (1968)). Courts employ a two-part analysis to evaluate whether an identification has been irreparably tainted by an impermissibly suggestive pretrial identification procedure. <u>See United States v. Love</u>, 746 F.2d 477, 478 (9th Cir. 1984). The first step is to determine whether the pretrial identification was unduly suggestive. <u>Simmons</u>, 390 U.S. at 384. This may occur when a photographic identification procedure "emphasize[s] the focus upon a single individual," thereby increasing the likelihood of misidentification. <u>United States v. Bagley</u>, 772 F.2d 482, 493 (9th Cir. 1985). Whether an identification procedure was unduly suggestive is a fact-specific determination, which may involve consideration of the size of the array, the manner of its presentation by the officers, and the details of the photographs themselves. <u>Id</u>.

If the identification procedure was unduly suggestive, the second step requires a determination of whether the totality of the circumstances surrounding the eyewitness's identification indicates that the identification was nonetheless reliable. <u>Neil v. Biggers</u>, 409 U.S. 188, 199 (1972); <u>Simmons</u>, 390 U.S. at 383. Factors considered in assessing reliability include: (1) the opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the prior description; (4) the witness's level of certainty at the confrontation; and (5) the length of time between the crime and the identification. <u>Neil</u>, 409 U.S. at 199-200; <u>Manson v. Brathwaite</u>, 432 U.S. 98, 114 (1977). The corrupting effect of the suggestive identification itself is to be weighed against these factors. <u>Id</u>. Where "the indicia of reliability are strong enough to outweigh the corrupting effect of the police arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." <u>Perry v. New Hampshire</u>, 565 U.S. 228, 232 (2012).

Further, any possible prejudice that the defendant may have suffered from suggestive identification procedures may be mitigated by cross-examination and other courtroom safeguards. <u>See Simmons</u>, 390 U.S. at 384 (danger that photo lineup technique may result in conviction based on misidentification may be lessened by cross-examination at trial).

        b.  *Analysis*

In this case, the state court assumed that the identification procedure was impermissibly suggestive; however, the court determined that there was no substantial likelihood of misidentification. The state court determination was not objectively unreasonable.

Considering the totality of the circumstances, there is no reasonable likelihood of irreparable misidentification.  As noted by the appellate court, Rocha stated he had seen the gunman's face and could identify him "if he saw him" again. Vasquez, 2018 WL 716845, *21. He advised officers who arrived on the scene that the gunman was a Hispanic male with a beanie and a goatee, and he was in a black Honda Accord. Id.  When Rocha was shown a photograph of Petitioner, he immediately identified him as the gunman. Id.  Rocha's identification was corroborated with substantial evidence.  Id.  GPS data from Petitioner's ankle monitor confirmed he was at the AM/PM minimart at the exact time of the shooting.  Id.  It further showed Petitioner fled immediately after the shooting. Id.  In addition, video surveillance footage captured Petitioner at the AM/PM standing alongside a black car. Id.

Based on the foregoing, Petitioner has failed to demonstrate that the state court rejection of his claim was contrary to clearly established Supreme Court precedent, or that the state court's decision was an unreasonable application of the factors noted above.  Therefore, the claim should be denied.

        2.  Instructional Error

Petitioner states there was evidence to support a theory that victim Rocha had a gun and may have fired one or two shots first.  He claims the trial court committed prejudicial error by failing to instruct on self-defense and imperfect self-defense.  Petitioner presented this claim on direct appeal.  The Fifth DCA denied the claim in the last reasoned decision as follows:

        a. *Background*.

At the jury instruction conference, the following exchange transpired:

> "THE COURT: And just so we're clear, I did not hear any substantial evidence that would necessitate giving a[n] ... instruction on voluntary manslaughter or any on self-defense or any related instructions. [¶] Any record either counsel would like to make in that regard?

"[DEFENSE COUNSEL]: Neither of those instructions are being requested by the defense.

"[PROSECUTOR]: Submit, your Honor.

"THE COURT: Okay. ..."

In his summation, defense counsel theorized Rocha provoked the shooting at 7–Eleven:

"[W]hat if [Rocha] actually had that gun that we talked about that we knew that he did have and of course he denies ever brandishing. What if that gun was—when [Rocha] saw that Honda come up, recognized the Honda. Knows I gotta get that car back because I want that heroin, otherwise, I'm gonna get killed for not delivering the heroin that I smuggled up here from Mexico. And so he pulls his gun because I'm going to get that car back.

"... We know [Rocha] had a gun. We know he was furious about not having that Honda, whether it was really for heroin reasons or not. We know that he previously went to [defendant]'s house and threatened him through the security cameras. So this wouldn't necessarily be out of character for [Rocha] to start threatening again. [¶] ... [¶]

"Evidence that [Rocha] brandished his gun. Was there anything that supports that theory? Absolutely. What was the first thing [Rocha] did after the shots were fired? Before he called 911. Before he checked on his friend who was sitting next to him, shot in the head, what was the first thing he did? He took his gun and he went and hid his gun in the bushes.

"Why? Why do you need to hide your gun if you haven't done something with it that you weren't supposed to do? What reason is there? There's no reason. The only reason you go and you hide your gun before you call 911, before you check on your friend who has just been shot in the head is because you don't want to get in trouble because you've done something with that gun that you weren't supposed to do, like point it at someone who then fired back at you.

"And then he lies about the gun and continues to lie about the gun to the police. Why? Because he doesn't want them to know he had a gun because he did something he was not supposed to do with that gun and he doesn't want to get in trouble. That's why he hid the gun. That's why he lied about the gun. That's why he continues to lie about the gun. Again, why would he need to lie about the gun if he hadn't done anything wrong with that gun?

"And there are times in the interview and you can go back and listen to them and watch them all.... [Rocha] repeatedly tells Detective Moore that he feels guilty and he feels like he got his friend killed. He feels like his friend's family is going to bring this back on him like he's the reason that [Ortiz] is dead.

"Maybe he's being honest there. Maybe he is the reason [Ortiz is] dead. Maybe if [Rocha] hadn't pulled his gun and acted like a lunatic, trying to get that heroin in that car back, no shots would have been fired that night. [Ortiz] would still be here. We wouldn't be here. [Rocha] feels guilty because he did pull that gun and that set everything in motion."

b. *Analysis—instruction on self-defense.*

"'"It is settled that in criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence"' and '"necessary for the jury's understanding of the case."' [Citations.] It is also well settled that this duty to instruct extends to defenses 'if it appears ... the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case.' [Citations.]" (*People v. Brooks* (2017) 3 Cal.5th 1, 73.)

"For killing to be in self-defense, the defendant must actually and reasonably believe in the need to defend." (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082 (*Humphrey*).) "'[T]he circumstances must be sufficient to excite the fears of a reasonable person....' [Citations.] Moreover, ... the fear must be of imminent harm. 'Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury.' [Citation.]" (*Ibid.*) "'[A]ny right of self-defense is limited to the use of such force as is reasonable under the circumstances. [Citation.]'" (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.)

At the motion hearing, defense counsel asserted the evidence would show Rocha "may have ... attempted to use [a] gun or used [a] gun [the] night [of the shooting] prompting whatever shooting may have occurred afterwards." (See *ante*, at p. 60.) He reiterated as much in his summation to the jury, even though he had seemingly accepted at the jury instruction conference the court's conclusion that the evidence did not warrant a self-defense instruction. On appeal, defendant insists a "[f]ailure to properly instruct on self-defense is reviewed as federal constitutional error" under the "harmless beyond a reasonable doubt" standard prescribed in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*).

Assuming, arguendo, the court's decision not to instruct the jury on self-defense violated defendant's constitutional rights, such an error was harmless under either *Watson* or *Chapman* because any evidence supporting of self-defense "was, at best, extremely weak." (*People v. Sakarias* (2000) 22 Cal.4th 596, 621; accord, *People v. Manriquez* (2005) 37 Cal.4th 547, 582–583.) Rodrigo, a percipient witness, did not observe anything that would have corroborated defense counsel's account. Furthermore, the record established (1) defendant arrived at 7–Eleven after Rocha and Ortiz; (2) defendant was at 7–Eleven for only a few seconds; (3) immediately following defendant's arrival, three shots were fired; (4) immediately following the gunfire, defendant fled the scene; and (5) none of the shots were fired by Rocha or Ortiz. (See *ante*, at pp. 53, 61–62.) In other words, there was little direct or circumstantial proof "'"defendant was actually in fear of his life or serious bodily injury"'" (*People v. Watie* (2002) 100 Cal.App.4th 866, 877), "'the conduct of [Rocha and/or Ortiz] was such as to produce that state of mind in a reasonable person'" (*ibid.*), and "'defendant's fear [was] of imminent danger to life or great bodily injury'" (*Humphrey, supra*, 13 Cal.4th at p. 1082, italics omitted).

c. *Analysis—instruction on voluntary manslaughter via imperfect self-defense.*

"'"It is settled that in criminal cases, even in the absence of a request, the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.]" (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) "That obligation has been held to include giving instructions on lesser included offenses when the evidence raises a question as to whether all of the

elements of the charged offense were present [citation], but not when there is no evidence that the offense was less than that charged. [Citations.]" (*Ibid.*) "[T]he existence of '*any* evidence, no matter how weak' will not justify instructions on a lesser included offense, but such instructions are required whenever evidence that the defendant is guilty only of the lesser offense is 'substantial enough to merit consideration' by the jury. [Citations.] 'Substantial evidence' in this context is '"evidence from which a jury composed of reasonable [persons] could ... conclude []"' that the lesser offense, but not the greater, was committed." (*Id.* at p. 162.)

"'Murder is the unlawful killing of a human being with malice aforethought. [Citation.] A defendant who commits an intentional and unlawful killing but who lacks malice is guilty of ... voluntary manslaughter. [Citation.]' [Citation.] Generally, the intent to unlawfully kill constitutes malice. [Citations.] 'But a defendant who intentionally and unlawfully kills lacks malice ... when the defendant kills in "unreasonable self-defense"—the unreasonable but good faith belief in having to act in self-defense [citations].' [Citation.] Because ... unreasonable self-defense reduce[s] an intentional, unlawful killing from murder to voluntary manslaughter by negating the element of malice that otherwise inheres in such a homicide [citation], voluntary manslaughter of [this] ... form[ ] is considered a lesser necessarily included offense of intentional murder [citation]." (*Breverman, supra*, 19 Cal.4th at pp. 153–154, italics & fn. omitted.)

"Under the doctrine of imperfect self-defense, when the trier of fact finds that a defendant killed another person because the defendant *actually*, but unreasonably, believed he was in imminent danger of death or great bodily injury, the defendant is deemed to have acted without malice and thus can be convicted of no crime greater than voluntary manslaughter." (*In re Christian S.* (1994) 7 Cal.4th 768, 771.) "[T]he doctrine is narrow. It requires without exception that the defendant must have had an *actual* belief in the need for self-defense.... Fear of future harm—no matter how great the fear and no matter how great the likelihood of the harm—will not suffice. The defendant's fear must be of *imminent* danger to life or great bodily injury." (*Id.* at p. 783.)

Both self-defense and imperfect self-defense require the accused to have a subjective belief in the need to defend and a fear of imminent danger. (See *Humphrey, supra*, 13 Cal.4th at p. 1082.) As we previously discussed, however, there was little direct or circumstantial proof of these elements. (See *ante*, at pp. 67–68.) Hence, we necessarily conclude there was no ""'"evidence from which a jury composed of reasonable [persons] could ... conclude[ ]"' that the lesser offense, but not the greater, was committed" (*Breverman, supra*, 19 Cal.4th at p. 162) and no instruction on voluntary manslaughter via imperfect self-defense was warranted.

Vasquez, 2018 WL 716845, at *31–34.

    *a.  Teague*

Respondent contends that part of Petitioner's claim, specifically Petitioner's claim that the trial court was required to instruct on lesser-included offenses, is barred by Teague v. Lane, 489 U.S. 288 (1989).  Under Teague, a new constitutional rule of criminal procedure will not be applied or announced on federal habeas review unless it places certain primary individual conduct

beyond the States' power to proscribe or is a "watershed" rule of criminal procedure. Id. at 310.

"In general . . . a case announces a new rule when it breaks new ground or imposes a new

obligation on the States or the Federal Government." Id. at 301. When Teague is properly raised

by the State, "the court must apply Teague before considering the merits of the claim." Horn v.

Banks, 536 U.S. 266, 267 (2002) (per curiam).

Once raised, Petitioner bears the burden of demonstrating that the rule is not new, but

compelled by existing precedent. O'Dell v. Netherland, 521 U.S. 151, 156 (1997). Teague is

analyzed using a three-step approach: 1) The court must ascertain the date on which the

defendant's conviction and sentence became final; 2) The court must "survey the legal landscape

as it then existed," and "determine whether a state court considering the defendant's claim at the

time the conviction became final would have felt compelled by existing precedent to conclude

that the rule the defendant seeks was required by the Constitution"; and 3) "[I]f the court

determines that the defendant seeks the benefit of a new rule, the court must decide whether that

rule falls within one of two narrow exceptions to the nonretroactivity principle." Caspari v.

Bohlen, 510 U.S. 383, 390 (1994). One exception concerns new rules placing "certain kinds of

primary, private individual conduct beyond the power of the criminal law-making authority to

proscribe." Teague, 489 U.S. at 290. The second exception is for "watershed rules of criminal

procedure implicating the fundamental fairness and accuracy of the criminal proceeding."

Whorton v. Bockting, 549 U.S. 406, 417 (2007). The second exception is extremely narrow, and

the Supreme Court has observed "that it is unlikely that any such rules ha[ve] yet to emerge[]."

Id. at 418.

As correctly noted by Respondent, there is no clearly established federal constitutional

right to lesser-included offense instructions in non-capital cases. United States v. Rivera-Alonzo,

584 F.3d 829, 834 n. 3 (9th Cir. 2009) (citing Solis v. Garcia, 219 F.3d 922, 929 (9th Cir. 2000)).

The Court cannot find a constitutional right to a lesser-included offense instruction here as that

would require the application of a new rule of law, something the court cannot do under the

holding in Teague. See Solis, 219 F.3d at 929 (habeas relief for failure to instruct on lesser

included offense in non-capital case barred by Teague because it would require the application of

a new constitutional rule); Turner v. Marshall, 63 F.3d 807, 819 (9th Cir.1995), *overruled on other grounds by* Tolbert v. Page, 182 F.3d 677 (9th Cir.1999) (en banc) (same). In addition, the two exceptions in Teague do not apply. The first exception does not apply because Petitioner is not seeking a rule that would place "certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe." Teague, 489 U.S. at 290. The second exception does not apply because the rule Petitioner is seeking cannot be considered a "watershed" rule "implicating the fundamental fairness and accuracy of the criminal proceeding." Id.

### *b. Failure to State a Cognizable Claim*

In addition, the claim fails to present a federal question. See Windham v. Merkle, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."). For the same reasons, Petitioner's claim cannot survive scrutiny under 28 U.S.C. § 2254(d). Federal habeas relief is barred unless Petitioner can demonstrate that the state court's alleged failure was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court. Since there is no clearly established Supreme Court authority requiring lesser-included offense instructions in a non-capital case, Petitioner's claim is barred under § 2254(d).

### 3. Ineffective Assistance of Counsel

In a related claim, Petitioner alleges defense counsel was ineffective in failing to request instructions on perfect and imperfect self-defense. Petitioner also raised this claim on direct appeal. In the last reasoned decision, the Fifth DCA denied the claim as follows:

> "In order to establish a claim for ineffective assistance of counsel, a defendant must show that his or her counsel's performance was deficient and that the defendant suffered prejudice as a result of such deficient performance." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–692 (*Strickland*).) "To demonstrate deficient performance, defendant bears the burden of showing that counsel's performance ""''fell below an objective standard of reasonableness ... under prevailing professional norms."''" [Citation.]" (*People v. Mickel, supra,* at p. 198.) "To demonstrate prejudice, defendant bears the burden of showing a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. [Citations.]" (*Ibid.*) "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" (*People v. Ledesma* (1987) 43 Cal.3d 171, 218, quoting *Strickland, supra,* at p. 694.)

> "'[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies.... If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, ... that course should be followed.'" (*In re Fields* (1990) 51 Cal.3d 1063, 1079, quoting *Strickland, supra*, 466 U.S. at p. 697.)
>
> At the jury instruction conference, defense counsel appeared to acquiesce in the court's conclusion it "did not hear any substantial evidence that would necessitate giving a[n] ... instruction on voluntary manslaughter or any on self-defense or any related instructions" and decided not to request such instructions. In his summation, though, he still argued Rocha provoked the 7–Eleven shooting in his summation. (See *ante*, at pp. 65–66.) Notwithstanding this incongruity, we find no reasonable probability of a more favorable verdict for defendant had instructions on self-defense and voluntary manslaughter via imperfect self-defense been requested and given. Both self-defense and imperfect self-defense require the accused to have a subjective belief in the need to defend and a fear of imminent danger. (See *Humphrey, supra*, 13 Cal.4th at p. 1082.) As we previously discussed, however, there was little direct or circumstantial proof of either element. (See *ante*, at pp. 67–68.) Instead, the evidence supported defendant's convictions for first-degree murder, attempted murder, shooting at an occupied motor vehicle, and illegal firearm possession. (See *ante*, at pp. 44–45, 53, 61–62, 67–68.)

Vasquez, 2018 WL 716845, at *34-35.

### a. *Legal Standard*

Effective assistance of counsel is guaranteed by the Due Process Clause of the Fourteenth Amendment. Evitts v. Lucey, 469 U.S. 387, 391-405 (1985). Claims of ineffective assistance of counsel are reviewed according to Strickland's two-pronged test. Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989); United States v. Birtle, 792 F.2d 846, 847 (9th Cir.1986); see also Penson v. Ohio, 488 U.S. 75 (1988) (holding that where a defendant has been actually or constructively denied the assistance of counsel altogether, the Strickland standard does not apply and prejudice is presumed; the implication is that Strickland does apply where counsel is present but ineffective).

To prevail, Petitioner must show two things. First, he must establish that counsel's deficient performance fell below an objective standard of reasonableness under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, Petitioner must establish that he suffered prejudice in that there was a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal. Id. at 694. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome of the trial. Id. The relevant inquiry is not what

24

1  counsel could have done; rather, it is whether the choices made by counsel were reasonable.

2  Babbitt v. Calderon, 151 F.3d 1170, 1173 (9th Cir. 1998).

3        With the passage of the AEDPA, habeas relief may only be granted if the state-court

4  decision unreasonably applied this general Strickland standard for ineffective assistance.

5  Knowles v. Mirzayance, 556 U.S. 111, 122 (2009).  Accordingly, the question "is not whether a

6  federal court believes the state court's determination under the Strickland standard "was incorrect

7  but whether that determination was unreasonable–a substantially higher threshold."  Schriro v.

8  Landrigan, 550 U.S. 465, 473 (2007); Knowles, 556 U.S. at 123.  In effect, the AEDPA standard

9  is "doubly deferential" because it requires that it be shown not only that the state court

10  determination was erroneous, but also that it was objectively unreasonable.  Yarborough v.

11  Gentry, 540 U.S. 1, 5 (2003).  Moreover, because the Strickland standard is a general standard, a

12  state court has even more latitude to reasonably determine that a defendant has not satisfied that

13  standard.  See Yarborough v. Alvarado, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule

14  application was unreasonable requires considering the rule's specificity.  The more general the

15  rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

16        *b.  Analysis of Claim*

17        The state court correctly analyzed the claim using the Strickland standard.  Therefore, the

18  only question before this Court is whether the application was objectively unreasonable.  The

19  Court finds that it was not.

20        The state court reasonably determined that Petitioner suffered no prejudice.  Assuming

21  defense counsel erred by failing to request instructions on self defense, there is no reasonable

22  likelihood that the result would have been different.  As noted by the trial court, there was scant

23  evidence from which a jury could find that defendant acted in fear of his life or serious bodily

24  injury.  On the other hand, the evidence supporting Petitioner's convictions, including eyewitness

25  testimony, video surveillance footage, GPS monitoring data, and ballistics, was substantial.

26  Accordingly, even if counsel had requested self defense instructions, it is clear it would not have

27  affected the outcome.  The state court's decision was not unreasonable and the claim should be

28  rejected.

### 4. Bifurcation

Petitioner claims the trial court erred by failing to bifurcate the trial of the gang allegations from the other charges. He further claims he was prejudiced by the trial court's instruction that the jury could consider gang evidence to prove motive. Petitioner raised this claim on direct review, and it was denied by the Fifth DCA as follows:

> a. *Background*.

> Beagley first testified about his expertise on the Varrio Bakers at the June 2014 preliminary hearing. He specified the primary activities of the gang include "[m]urder, weapons violations, robbery, carjacking, grand theft auto, vandalism, [and] narcotic sales." Beagley offered the following predicate offenses to establish a pattern of criminal gang activity: (1) assault with a deadly weapon; (2) transportation of a controlled substance; (3) kidnapping to commit robbery; and (4) possession of a firearm by a felon. These predicate offenses were attributed to various members of the Varrio Bakers; none were attributed to defendant. Beagley then discussed the importance of respect and fear to the Varrio Bakers.

> Beagley concluded defendant was an active member of the Varrio Bakers at the time of the 7–Eleven shooting. He based his opinion on police reports documenting various contacts with defendant; defendant's numerous gang-related tattoos; defendant's admission of his gang membership; and defendant's arrest in the instant case for crimes in which Varrio Bakers primarily engage. As to whether defendant "shooting at [Rocha] or ... shooting at the [Saturn]" would "benefit, if at all, the Varrio Bakers." Beagley answered:

>> "It benefits the Varrio Bakers 'cause ... [defendant] is from the Varrio Bakers. Like he mentioned [in] the video that we saw [involving Dunn], if he ... let them get away with this one what's going to stop the next from doing it. He's talking about respect and being disrespected, being punked.

>> "He had to react to this because, you know, if he let, you know, a drug user or tweaker like Rocha disrespect him and punk him, what's going to stop the next guy from trying to do that or disrespecting the Varrio gang himself. There would [be] loss of respect for the gang and for [defendant]."

> At the preliminary hearing, the prosecutor offered a possible motive for the 7–Eleven shooting:

>> "We consider the importance of respect [to defendant]. We take the knowledge we have from Officer Beagley that [defendant]'s a member of the Varrio Bakers, and we combine that and we think what would a Varrio Baker do, particularly what would [defendant] do if this type of offense were perpetrated upon him.

>> "And when [Rocha] takes that car in the manner that he does and then has the nerve to keep calling and trying to use it as [a] bargaining chip, I think that that is a level of disrespect that [defendant] simply would not tolerate. [¶] ... [¶]

>> "The People's position is that [defendant] has engrained this gang life-style

26

and this culture, as ridiculous as it may be, into his own persona so when ... Rocha does what he did [defendant] had to respond. He had to respond because the reputation of himself, of the gang and the ability of the gang to continue to command respect from other people in the community or from other gang members was at stake."

Defendant moved to bifurcate the gang enhancement allegations, asserting "[t]he only purpose in trying the gang charges along with the underlying charges would be to inflame the passions of the jury in hopes that they convict, not on the merits of the case but rather out of fear created by the gang evidence." At a December 2014 motion hearing, the court tentatively denied the request and gave the parties an opportunity to respond. Both parties submitted and the tentative ruling became final.

After close of evidence, the court and counsel discussed jury instructions off the record. Later, the court listed the instructions it intended to give, including CALCRIM No. 1403 (Limited Purpose of Evidence of Gang Activity), and afforded counsel the opportunity to object. Neither did so.

Prior to closing arguments, the court instructed the jury:

"[CALCRIM No. 1403:] You may consider evidence of gang activity only for the limited purpose of deciding whether the defendant acted with the intent, purpose, and knowledge that are required to prove the gang-related crimes and enhancements and special circumstance allegations charged or that the defendant had a motive to commit the crimes charged.

"You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert witness in reaching his or her opinion. You may not consider this evidence for any other purpose. You may not conclude from this evidence that the defendant is a person of bad character or that he has a disposition to commit crime."

In his summation, the prosecutor reiterated his theory on defendant's motive:

"This idea of disrespect and respect. It sounds ridiculous to people who aren't from this culture. But ... think about what value respect plays to people who are in gangs, to gang members, particularly to Varrio Bakers members and particularly to [defendant]. [¶] ... [¶]

"... [T]his idea of respect and how it plays into a role with gang members is so important for gang members themselves personally and for the gang as a whole. And when we talk about what [Rocha] did to [defendant], by going to his house the way he did, stealing that car and intentionally making a scene for the surveillance cameras. Going to a gang member's house and doing that, it is so stupid. And [Rocha] should really know better.

"But that level of disrespect is something that [defendant], a member of the Varrio Bakers for more than 15 years, is not going to let go unpunished. He's not going to let that go. Because he can't. That's part of what gang membership is. That's what they thrive off of. You can't let some punk like ... Rocha come to your house and do that. And [defendant], as a Varrio Baker, simply could not let that slide, and there were consequences. [¶] ... [¶]

27

"There had to be consequences.... Rocha was completely disrespecting [defendant], to use the language of [defendant], and the consequence unfortunately fell the hardest on ... Ortiz."

b. *Analysis*.

"It shall be the duty of the judge to control all proceedings during the trial, and to limit the introduction of evidence and the argument of counsel to relevant and material matters, with a view to the expeditious and effective ascertainment of the truth regarding the matters involved." (§ 1044.) Pursuant to section 1044, a trial court possesses "[g]eneral authority to bifurcate trial issues" (*People v. Calderon* (1994) 9 Cal.4th 69, 74–75), including gang enhancement allegations (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*)).

"In cases *not* involving the gang enhancement, ... evidence of gang membership is potentially prejudicial and should not be admitted if its probative value is minimal. [Citation.] But evidence of gang membership is often relevant to, and admissible regarding, the charged offense. Evidence of the defendant's gang affiliation— including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime. [Citations.] To the extent the evidence supporting the gang enhancement would be admissible at a trial of guilt, any inference of prejudice would be dispelled, and bifurcation would not be necessary. [Citation.]" (*Hernandez, supra*, 33 Cal.4th at pp. 1049–1050.)

"This is not to say that a court should never bifurcate trial of the gang enhancement from trial of guilt.... [For instance,] [t]he predicate offenses offered to establish a 'pattern of criminal gang activity' (§ 186.22, subd. (e) ) need not be related to the crime, or even the defendant, and evidence of such offenses may be unduly prejudicial, thus warranting bifurcation. Moreover, some of the other gang evidence, even as it relates to the defendant, may be so extraordinarily prejudicial, and of so little relevance to guilt, that it threatens to sway the jury to convict regardless of the defendant's actual guilt." (*Hernandez, supra*, 33 Cal.4th at p. 1049.)

"[T]he trial court's discretion to deny bifurcation of a charged gang enhancement is ... broader than its discretion to admit gang evidence when the gang enhancement is not charged." (*Hernandez, supra*, 33 Cal.4th at p. 1050.) "In the context of severing charged offenses, ... 'additional factors favor joinder. Trial of the counts together ordinarily avoids the increased expenditure of funds and judicial resources which may result if the charges were to be tried in two or more separate trials.' [Citation.] Accordingly, when the evidence sought to be severed relates to a charged offense, the 'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried. [Citations.] When the offenses are joined for trial the defendant's guilt of all the offenses is at issue and the problem of confusing the jury with collateral matters does not arise. The other-crimes evidence does not relate to [an] offense for which the defendant may have escaped punishment. That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice.' [Citation.]" (*Ibid.*; see *ibid.* ["The analogy between bifurcation and severance is not perfect.... But much of what we have said about severance is relevant...."].) Hence,

"[e]ven if some of the evidence offered to prove the gang enhancement would be inadmissible at a trial of the substantive crime itself ... a court may still deny bifurcation." (*Ibid.*)

"We review the trial court's denial of the motion to bifurcate for abuse of discretion, based on the record as it stood at the time of the ruling." (*People v. Franklin* (2016) 248 Cal.App.4th 938, 952 (*Franklin*).) "Our review is guided by the familiar principle that '[a] court abuses its discretion when its rulings fall "outside the bounds of reason."' [Citations.]" (*Ibid.*; see *People v. Brown* (2004) 33 Cal.4th 892, 901 [""If right upon any theory of the law applicable to the case, [a ruling or decision] must be sustained regardless of the considerations which may have moved the trial court to its conclusion.""'].) "If the trial court's ruling was correct on the record before it, the ruling is subject to reversal only upon a showing that "'joinder actually resulted in 'gross unfairness' amounting to a denial of due process."' [Citation.]" (*Franklin, supra*, at pp. 952–953.)

Here, Beagley's testimony was admissible to prove the prosecutor's theory that defendant committed the 7–Eleven shooting as retaliation for Rocha stealing the Saturn from his home, an act of disrespect toward himself (a Varrio Baker member) and the Varrio Bakers as whole. "[G]ang evidence is 'relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related.' [Citation.] "'[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence."' [Citation.]" (*Franklin, supra*, 248 Cal.App.4th at p. 953.) [Fn.10] Furthermore, we find nothing extraordinarily prejudicial about Beagley's testimony, which was no more inflammatory than the evidence related to the crimes charged in the instant case. As to whether "' "joinder actually resulted in 'gross unfairness' amounting to a denial of due process" ' " (*Franklin, supra*, at p. 953), we point out the jury did not find true the gang special circumstance and gang enhancement allegations, strongly indicating "the jury did not accept the gang evidence ... uncritically" (*People v. Williams* (2009) 170 Cal.App.4th 587, 613). [Fn.11]

> [Fn.10] Thus, we necessarily reject defendant's claim the court "erro [neously] ... instruct[ed] that gang evidence could be considered on the issue of motive." (Boldface & capitalization omitted.)

> [Fn.11] Defendant counters with *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), in which Division Seven of the Second Appellate District concluded "certain extremely prejudicial gang evidence was not relevant to ... charges" stemming from a residential shooting involving the accused (*id.* at pp. 217–218). The gang expert in *Albarran*, however, conceded he did not know the reason for the shooting. (*Id.* at pp. 220, 227.)

Defendant insists the gang evidence was actually "a form of disposition evidence that is inadmissible to prove that [an accused] committed crimes in conformity with his disposition." (Italics omitted.) We note the court "properly instructed the jury that evidence of gang activity could be considered solely for the limited purpose of deciding whether ... [defendant] had a motive to commit the charged offenses." (*Franklin, supra*, 248 Cal.App.4th at p. 953; see *ante*, at pp. 36–37.) "We presume that the jury followed these limiting instructions, and there is nothing in this record to rebut that presumption." (*Franklin, supra*, at p. 953.)

<u>Vasquez</u>, 2018 WL 716845, at *16-19.

a. *<u>Legal Standard and Analysis</u>*

There is no clearly established Federal law which holds that joinder or consolidation of charges or sentencing enhancements violate the Constitution. In <u>United States v. Lane</u>, 474 U.S. 438, 446 n. 8 (1986), the Supreme Court stated in a footnote that "[i]mproper joinder does not, in itself, violate the Constitution. Rather, misjoinder would rise to the level of a constitutional violation only if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." However, in <u>Young v. Pliler</u>, the Ninth Circuit stated:

> <u>Lane</u> considered only the effect of misjoinder under Federal Rule of Criminal Procedure 8, and expressly stated that no constitutional claim had been presented. <u>See</u> <u>Lane</u>, 474 U.S. 438, 446 & n. 9, 106 S.Ct. 725, 88 L.Ed.2d 814 (1986). Thus, <u>Lane's</u> broad statement-found in a footnote without citation to any legal authority-that misjoinder could only rise to the level of a constitutional violation if it was so prejudicial as to violate due process, was probably dictum. Only Supreme Court holdings are controlling when reviewing state court holdings under 28 U.S.C. § 2254; Court dicta and circuit court authority may not provide the basis for granting habeas relief. <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71–72, 123 S.Ct. 1166, 155 L.Ed.2d 144 (2003).

<u>Young v. Pliler</u>, 273 Fed.Appx. 670, n. 1, 2008 WL 1757564 (9th Cir. 2008) (unpublished); <u>see also</u> <u>Collins v. Runnels</u>, 603 F.3d 1127, 1132–33 (9th Cir. 2010).

In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." <u>Williams</u>, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." <u>Id</u>. Given that there is no clearly established Federal law in this instance, the Court cannot grant relief, since habeas relief is triggered only when the state court adjudication runs afoul of clearly established federal law. <u>See</u> <u>Moses v. Payne</u>, 555 F.3d 742, 754 (9th Cir. 2009) (absent a Supreme Court decision that squarely addresses the issue it "cannot be said, under AEDPA, there is 'clearly established' Supreme Court precedent…and so we must defer to the state court's decision").

Even assuming for the sake of argument that the Supreme Court's footnote could be considered clearly established Federal law, no constitutional violation occurred in this case. The evidence was clearly relevant to prove Petitioner's motive, and the prejudice was not so great as

to deny Petitioner his right to a fair trial. Lane, 474 U.S. at 446, fn. 8. Furthermore, the jury was instructed that it could consider the gang evidence solely for the limited purpose of determining whether Petitioner had a motive to commit the offenses, and the jury is presumed to have followed the instruction. Weeks v. Angelone, 528 U.S. 225, 234 (2000). For the foregoing reasons, the claim should be rejected.

5. Admission of Evidence

Petitioner next claims he was denied due process by the admission of prejudicial video recordings that served no purpose other than to show Petitioner's evil character. He contends there was no permissible inference to be drawn from the evidence, and it created a substantial danger of inflaming the jury against him. The claim was raised on direct review, and it was denied by the Fifth DCA as follows:

a. *Background*.

Defendant moved in limine to exclude "a recording seized from ... defendant's cell phone that purports to be a conversation between ... defendant and a female companion" on the grounds of "improper character evidence, lack of foundation, hearsay, the Confrontation Clause of the United States and California Constitutions, and [Evidence Code section] 352." At the hearing on the motion, the court and the parties watched People's Exhibits Nos. 8–A and 9–A. Afterward, defense counsel argued:

"Starting with [People's] Exhibit [No.] 8[–A], the main problem, I think, is we don't have ... a witness that's going to come in and testify who was present during the recording of that video or has any knowledge of what that situation that's allegedly purported to be shown on the video actually is. Therefore, all we're doing is we're showing the jury a video and asking them to, essentially, speculate as to what's behind the actions that are occurring, who the individuals that are being talked about are, which I think would be inappropriate.

"And, additionally, I think under [Evidence Code section] 352, the issues that are presented in that video are removed from the issues that are present in this case. And I think it would be overly prejudicial to show that video to the jurors, have them develop some type of bad character idea of [defendant] based on speculation that he may have been involved in trying to get someone else to steal things, and then attempting to punish them in some way when they failed to get the right things. I think that that would be the equivalent of bad character evidence, which would not be admissible.

"And I also think under [Evidence Code section] 352, the probative value is far outweighed by any prejudicial effect of what's on that video. [¶] ... [¶]

"With respect to People's [Exhibit No.] 9–A, there are similar issues.... [¶] First of all, without someone coming in to testify saying, 'That's me on the

31

recording,' I don't know that there's going to be sufficient foundation ... for anyone to say who either of those voices are, specifically the female's voice. [¶] ... [W]ithout someone testifying as to who's on that recording and what's actually being discussed, what's the background there, we're asking the jurors to speculate based on very limited information.

"... Under [Evidence Code section] 352, we're dealing with a situation that really doesn't have anything to do with the present case. I think that the probative value, if any, is far outweighed by the prejudicial effect of showing a video like that to the jurors. [¶] The actual effect it's going to have is to serve as bad character evidence.... [E]ven if there is some other probative value to it, the main effect is going to be the jurors are going to form an opinion of [defendant] in terms of his character based on the conduct alleged to him in that video. And I think that would be inappropriate."

The prosecutor responded:

"Your Honor, regarding People's [Exhibit No.] 8–A, ... the evidence is going to show that that video is actually taken in the garage of a house on Zelda Way, a house where [defendant] lived for a substantial amount of time prior to about late March, early April of 2014. [¶] That garage has a large 'V' spray painted in white and black on the garage floor. We have pictures of that from prior searches that the People will seek to admit.

"The people in the video, you can hear [defendant's] voice in the beginning and then obviously at the end when the video transfers, you can see the person holding the camera walks inside. And you can clearly see [defendant] ask the question, 'Did you record it?'

"To the extent that there needs to be witnesses to explain the circumstances, it's pretty obvious who the people are. Melissa ... is the female who appears to be holding the camera. She's referenced by name, and her voice is also pretty easy for anyone who's talked to her to recognize in the situation. [¶] The person who's being interrogated, ... is ... Sandhu. And the reason the People know that is because when [defendant] was arrested on April 10th, he had ... Sandhu's identification on him.

"The video is from late March, just weeks before the shooting in this case. And it is very clearly an issue where [defendant] wants a recording of this person being terrified. [Defendant] has apparently done something, hit him with something. [¶] And the important part about that is that it's important to ... defendant to have this memorialized, to have it documented. And it's something that he keeps. And so when he's arrested on April 10th, he's got a copy of this video on the phone in his possession. [¶] ... [I]t is clear that Melissa, [defendant]'s wife, is recording it at his request and is doing so covertly.

"... [I]n People's [Exhibit No.] 9–A, it seems pretty clear that [defendant] is the one who's making sure that this is recorded in a way that appears that the phone is being hidden so that the victim, ... Dunn, can't hear it.

"As far as the probative nature of this evidence, for People's [Exhibit No.] 8–A, there has been a series of cases that deal with gang cases. And the Court of Appeal[ ] has made it clear that they want something other than generalized opinions of gang experts to support gang motive and the gang

enhancement. We certainly have a gang enhancement and special circumstance in this case. [¶] And here we have a scenario where we don't need to rely simply upon the opini[on]s of an expert about the importance of respect, about the importance of fear that takes place in criminal street gangs, in particular in this case, the Varrio Bakers. [¶] We have absolute clear evidence of the manner in which ... defendant uses his authority to control people, to frighten them and to control them.

"... [B]oth of these videos are clear-cut examples of that. And the fact that ... defendant ... either appears to be recording it himself or directing others to record it, suggests that he wants even evidence of this to be maintained.

"When we look at People's [Exhibit No.] 9–A, the way we know who these people are is by listening to their voices.... Moore will be able to testify that this girl in the video is ... Dunn. He knows that. He's talked to her multiple times. He's talked to her while she's been crying. And we have a recording of that as well. [¶] ... [Defendant]'s voice is pretty easy to spot. With People's [Exhibit No.] 8–A, we have a video of him talking. And then People's [Exhibit No.] 9–A, you can clearly hear his voice.

"The issue with [People's Exhibit No.] 9–A, the relevance, the probative value is essential.... Count 9, the [section] 422 charge in this case, that's the evidence that I've got, and that's it.... Dunn, I don't know where she is. She has an active warrant. She has not been cooperative in this investigation, to the extent that we have video of her six minutes before the shooting of the murder, and appears to be in a car with [defendant].... [¶] ... [¶]

"The issue of whether this is being used to target [defendant]'s character, it's not because it is essential for the gang evidence. [¶] ... [W]hat we have in this case is a scenario where the People's theory is that ... Rocha stole a car directly from this house on Zelda that [defendant] lived at, had surveillance cameras. And ... Rocha made a show about it. And he's intentionally putting it in the face of ... defendant that he is taking it from him. [¶] And that level of disrespect, while to anyone on the street, might prompt a call to the police about a stolen car, for [defendant], a man who has his gang affiliation tattooed all over his body—on the back of his head, on his chest, on his knees—who has dedicated so much of his life and has plastered this aspect of gang culture upon him, doing something like that to him is a level of disrespect that he simply won't tolerate.

"And so we look at People's [Exhibit No.] 9–A, and we see this issue where ... Dunn is someone who's close to him, is doing something as trivial as not stealing for him or not stealing very well for him. And the way that he goes after her for that to terrorize her is how he is exerting his influence and ... those types of roles within the Varrio Bakers. [¶] He talks about there being consequences of not following the rules. He specifically uses the phrase, 'straight, utter disrespect.' And he repeats it. That's how important it is to [defendant] when you talk about respect within the culture of the Varrio Baker.

"And that's what the gang expert will rely upon when he talks about why it's such a big deal when ... Rocha shows up to [defendant]'s house and just takes the car right from under him. And so that plays into what happens in the next couple weeks where there are multiple shootings toward ... Rocha when ... Rocha is driving this car that is easily recognizable to ... defendant.

33

"And so when you put everything together, you can see the importance, the probative value of this type of evidence, clearly with People's Exhibit [No.] 9 [–A] because it goes directly to a charged count, but it also ties into the gang evidence and the motive for the murder charge in this case."

The court ruled:

"I'm going to allow both of them with limiting instructions. I think to allow it without a limiting instruction would be inappropriate. [¶] ... [¶]

"And the limiting instruction in regard to [People's Exhibit No.] 8–A would be, it can be considered as to motive as to the gang charges. And we'll say that out more specifically.

"And then ... also as to motive pertaining, perhaps, to Count 9.

"[People's] Exhibit [No.] 9–A, same. It would be in regard to motive pertaining to the murder and attempted murder charges. And then also as to Count 9 itself. And then as to the gang charges. [¶] ... [¶]

"Undue consumption of time is not an issue.

"And prejudicial versus probative has been considered. And it is more probative than prejudicial, in my view."

Prior to closing arguments, the court issued CALCRIM No. 303 (Limited Purpose Evidence In General):

"During the trial, certain evidence was admitted for a limited purpose. You may consider that evidence only for that purpose and for no other."

The court also issued CALCRIM No. 1403, instructing the jury it "may consider evidence of gang activity only for the limited purpose of deciding whether ... defendant had a motive to commit the crimes charged," inter alia. (See *ante*, at pp. 36–37.)

In his summation, the prosecutor linked People's Exhibits Nos. 8–A and 9–A with his theory on defendant's motive for the 7–Eleven shooting:

"This idea of disrespect and respect. It sounds ridiculous to people who aren't from this culture. But ... think about what value respect plays to people who are in gangs, to gang members, particularly to Varrio Bakers members and particularly to [defendant].

"When you listen to that recording of [defendant] threatening ... Dunn and telling her she's going to stab herself. 'You're gonna stab yourself.' He's mad at her. And the reason he's mad at her, you can figure out from these videos, is that [defendant] is running a little bit of a criminal enterprise where he's controlling people. He's getting people to steal for him.... Sandhu, the guy in the garage, talks about how he was supposed to steal certain things from Walgreens, but ... defendant's wife, Melissa, is upset at him because he didn't steal the right things.

"... Dunn, in that recording when she's being threatened, the reason that [defendant] is so upset with her is because she's not even trying. She's not

34

even trying to steal. And it's very clear that part of her job for him is to steal things. And she's not doing it. Or at least not doing it enough.

"And it's not that she's not stealing enough that really bothers him.... He says the real problem is that ... she can do it but she chooses not to. And by not doing ... what he tells her to do, it is 'straight utter disrespect.' And he repeats it. Straight utter disrespect. And he talks about how important it is that he be respected because of the things that he does. He demands respect. Even from her. He demands this level of respect.

"During the other video from the cell phone where we have Melissa ..., ... defendant's wife is talking about what's going on with ... Sandhu, who is scared for his life because he's just been apparently slapped by ... defendant. And ... Sandhu clearly thinks that he's being held there for some reason. That he's not really free to leave, despite Melissa saying that he is. He feels that he has to stay there.... You're free to leave, but [defendant] asked you to stay here out of respect.

"And this idea of respect and how it plays into a role with gang members is so important for gang members themselves personally and for the gang as a whole. And when we talk about what [Rocha] did to [defendant], by going to his house the way he did, stealing that car and intentionally making a scene for the surveillance cameras. Going to a gang member's house and doing that, it is so stupid. And [Rocha] should really know better.

"But that level of disrespect is something that [defendant], a member of the Varrio Bakers for more than 15 years, is not going to let go unpunished. He's not going to let that go. Because he can't. That's part of what gang membership is. That's what they thrive off of. You can't let some punk like ... Rocha come to your house and do that. And [defendant], as a Varrio Baker, simply could not let that slide, and there were consequences. [¶] ... [¶]

"There had to be consequences for what [Rocha] did. Much like there had to be consequences for ... Dunn disrespecting [defendant] by not stealing. If I let you do this, then the next guy is gonna come along and he's gonna want to do the same thing. There had to be consequences. You have to follow the rules. This is what he says to her.

"The same thing applies when ... Rocha does what he does. There had to be consequences.... Rocha was completely disrespecting [defendant], to use the language of [defendant], and the consequence unfortunately fell the hardest on ... Ortiz."

b. *Analysis.*

At the outset, defendant concedes People's Exhibit No. 9–A was "relevant and necessary to prove" count 9 and contends the court should have severed that count. Under section 954, "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, ... or two or more different offenses of the same class of crimes or offenses, under separate counts ... provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately ...." "'Section 954, however, imposes no sua sponte duty of severance on trial courts. That section ... requires the defendant

35

to make a showing of "good cause" in order to obtain severance, and [a] defendant's failure to request a severance [forfeits] the matter on appeal.'" (*People v. Maury* (2003) 30 Cal.4th 342, 392.) Alternatively, under section 1004, subdivision 3, "[t]he defendant may demur to the accusatory pleading at any time prior to the entry of a plea, when it appears upon the face thereof ... [¶] ... [¶] ... [t]hat more than one offense is charged, except as provided in [s]ection 954...." "By statute, if misjoinder is evident on the face of the complaint and the defendant fails to challenge misjoinder by demurrer, the issue is forfeited." (*People v. Barros* (2012) 209 Cal.App.4th 1581, 1596, fn. 20, citing § 1012; see *People v. Kemp* (1961) 55 Cal.2d 458, 474.)

In the instant case, "[h]ad [defendant] felt the trial ... should, in the interests of justice, have been severed, it was incumbent upon him to demur or move for a severance." (*People v. Martin* (1967) 250 Cal.App.2d 263, 268.) He did neither, notwithstanding his attempts to frame his request to exclude People's Exhibit No. 9–A as "tantamount to a motion to sever Count 9" and "the functional equivalent of a demurrer." Thus, defendant forfeited the matter on the appeal.

Next, defendant argues the court erroneously admitted People's Exhibits Nos. 8–A and 9–A because they were irrelevant to prove a motive for the 7–Eleven shooting, were unduly prejudicial, and constituted inadmissible character evidence. Even assuming, arguendo, the court should have excluded these recordings, by constitutional mandate, "[n]o judgment shall be set aside, or new trial granted, in any cause, on the ground of ... the improper admission or rejection of evidence, ... unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice." (Cal. Const., art. VI, § 13.) "[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*); accord, *People v. Callahan* (1999) 74 Cal.App.4th 356, 363.)

Here, it is not reasonably probable defendant would have obtained a more favorable verdict. As noted, the totality of the circumstances indicated defendant was the gunman in the Honda Accord. (See *ante*, at pp. 44-45.) GPS data from defendant's ankle monitor showed defendant fleeing on foot from 7–Eleven, "support[ing] an inference of consciousness of guilt and constitut[ing] an implied admission." (*People v. Brooks* (1966) 64 Cal.2d 130, 138.) Moreover, the record does not support the notion the shooting was justifiable. (See *post*, at pp. 61–62.)

"In the absence of a violation of federal rights, we evaluate whether 'it is reasonably probable that a result more favorable to [defendant] would have been reached in the absence of the error.'" (*People v. Page* (2008) 44 Cal.4th 1, 42, quoting *Watson*, *supra*, 46 Cal.2d at p. 836.) Defendant maintains, however, the admission of People's Exhibits Nos. 8–A and 9–A violated his federal constitutional rights to due process. "[T]he admission of evidence in violation of state law may also violate due process, but only if the error rendered the defendant's trial fundamentally unfair." (*People v. Merriman* (2014) 60 Cal.4th 1, 70.) "'[T]he evidence must "be of such quality as necessarily prevents a fair trial."'" (*People v. Hunt* (2011) 196 Cal.App.4th 811, 817.) Based on the record before us, we cannot reach that conclusion. Hence, "[a]bsent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test...." (*People v. Partida* (2005) 37 Cal.4th 428, 439.)

1    <u>Vasquez</u>, 2018 WL 716845, at *21-26.

2                    *a.   <u>Legal Standard and Analysis</u>*

3         This claim is not cognizable on federal habeas review because the admissibility of

4    evidence is a matter of state law.  <u>Estelle</u>, 502 U.S. at 67-68 (state evidentiary ruling cannot

5    provide ground for federal habeas relief unless the admission of evidence violated due process).

6    In addition, Respondent correctly argues that Petitioner cannot show that the trial court's

7    admission of identification evidence was contrary to or an unreasonable application of Supreme

8    Court precedent pursuant to 28 U.S.C. § 2254(d), since there is no Supreme Court precedent

9    governing a court's discretionary decision to admit evidence as a violation of due process.  In

10   <u>Holley v. Yarborough</u>, the Ninth Circuit stated:

11          Under AEDPA, even clearly erroneous admissions of evidence that render a trial
            fundamentally unfair may not permit the grant of federal habeas corpus relief if not
12          forbidden by "clearly established Federal law," as laid out by the Supreme Court.
            28 U.S.C. § 2254(d). In cases where the Supreme Court has not adequately
13          addressed a claim, this court cannot use its own precedent to find a state court ruling
            unreasonable. <u>Musladin</u>, 549 U.S. at 77, 127 S.Ct. 649.
14
            The Supreme Court has made very few rulings regarding the admission of evidence
15          as a violation of due process. Although the Court has been clear that a writ should
            be issued when constitutional errors have rendered the trial fundamentally unfair,
16          <u>see</u> <u>Williams</u>, 529 U.S. at 375, 120 S.Ct. 1495, it has not yet made a clear ruling that
            admission of irrelevant or overtly prejudicial evidence constitutes a due process
17          violation sufficient to warrant issuance of the writ. Absent such "clearly established
            Federal law," we cannot conclude that the state court's ruling was an "unreasonable
18          application." <u>Musladin</u>, 549 U.S. at 77, 127 S.Ct. 649. Under the strict standards of
            AEDPA, we are therefore without power to issue the writ . . . .
19

20   <u>Holley v. Yarborough</u>, 568 F.3d 1091, 1101 (9th Cir. 2009); <u>see</u> <u>Moses v. Payne</u>, 555 F.3d 742,

21   760 (9th Cir. 2008) (holding that trial court did not abuse its discretion in excluding expert

22   testimony "[b]ecause the Supreme Court's precedents do not establish a principle for evaluating

23   discretionary decisions to exclude the kind of evidence at issue here").  Since there is no clearly

24   established Supreme Court precedent governing a trial court's discretionary decision to admit

25   evidence as a violation of due process, habeas relief is foreclosed.  <u>Id</u>.

26         Even if the Court were to consider the claim, Petitioner would not be entitled to relief.

27   The state court reasonably determined that the video recordings were relevant to the issue of

28   motive, and the admission of this evidence did not render the trial fundamentally unfair.

                                              37

Moreover, the evidence against Petitioner was strong. Petitioner fails to show that the trial court committed error, let alone constitutional error, and he fails to show any prejudice. The claim should be rejected.

### 6. Prosecutorial Misconduct

Petitioner claims the prosecutor committed misconduct by arguing facts not in evidence in order to vouch for the strength of the prosecution's case. Petitioner raised this claim on direct review. In the last reasoned decision, the appellate court rejected the claim as follows:

a. *Background*.

In his summation, defense counsel characterized gang evidence as a diversionary tactic:

> "The point of the gang evidence is this. The point of the gang evidence is to put Officer Beagley up here on the stand with a bag of mud and he sits here and just chucks mud at [defendant] for like an hour, however long he was up there. Let's talk about his past. Let's talk about his tattoos. Let's imagine what things in his house could stand for. Let's dirty him up as much as we can.

> "Why? Why are we doing that? It's to scare you into ignoring the fact that they haven't proved these charges. It's to distract you from the fact that there are holes all over this case. The hope is that you hear this gang evidence and you think [defendant] must be a horrible person....

> "Don't be scared. Don't let that evidence get to you because that gang evidence is not evidence of these charges. It has nothing to do with these charges. The only reason it's here is to scare you into ignoring the holes in this case, to distract you from the fact that the prosecution's theory doesn't match up with the facts in this case, doesn't match up with the science that they presented...."

In his rebuttal, the prosecutor responded to defense counsel's allegation:

> "There's one suggestion made by [defense counsel] that I want to address in the beginning because I'm a district attorney, a deputy district attorney, and I work in the Gang Unit and I deal with gang crimes a lot. And [defense counsel] suggests that the purpose of the gang evidence was to make ... defendant look bad. And that is absolutely not true.

> "The truth is that ... defendant is a member of a criminal street gang, the Varrio Bakers, and it is a gang that is terrorizing this community.... [D]efendant is charged with gang crimes and those gang crimes come from the Penal Code. All those numbers that are on the verdict form, ... [section] 186.22, [are] basically the gang statute. And when the [L]egislature got together and decided we need to do something about criminal street gangs, they actually put down in the law why they were doing it.

> "In [section] 186.21, the [L]egislature writes, 'The [L]egislature, however, further finds that the State of California is in a state of crisis'...."

38

Before the prosecutor could complete the sentence, defense counsel objected on the basis of "facts not in evidence."

The court called counsel to sidebar. The following exchange transpired outside the presence of the jury:

"[DEFENSE COUNSEL]: It's my understanding he's going to start reading the thoughts that the [L]egislature had when enacting the gang legislation, which I don't think there's been any evidence of. It would be hearsay at this point as well. [¶] ... [¶]

"[PROSECUTOR]: The Court can take judicial notice of any law and statute based upon the implications raised in defense closing argument. [¶] I think it's appropriate, if nothing else, for the People to have the opportunity to read the actual legislative findings in the [Penal] Code specific to the charges that apply in the case.

"THE COURT: The legislative findings aren't the law.

"[PROSECUTOR]: The legislative findings are the explanation of why the evidence is important and why it is not, as was suggested, merely to dirty ... defendant.

"I'm not going to get up there and say that I personally feel one way or the other, but the law is what the law is, and this is the reason for the law. It's the most neutral way of conveying to the jury that [defense counsel]'s argument is unfounded.

"THE COURT: What portion were you reading?...

"[PROSECUTOR]: [Section 186.]21. I began with the second paragraph.

"THE COURT: [Section] 186.21. Findings and declarations. [¶] You can read the first paragraph only.

"[PROSECUTOR]: Thank you."

The prosecutor proceeded with his response:

"The [L]egislature declared that, 'The [L]egislature hereby finds and declares that it is the right of every person, regardless of race, color, creed, religion, national origin, gender, gender identity, gender expression, age, sexual orientation, or handicap, to be secure and protected from fear, intimidation, and physical harm caused by the activity of violent groups and individuals.'

"And as a result, we got legislation that dealt specifically with criminal street gangs like the Varrio Bakers who do things in our community like shootings, like murders, like robberies, carjackings, the types of crimes that Officer Beagley told us only a few examples of. And that is what this group does.

"And so when we talk about gangs and the need to prosecute gang crimes and members of those groups who are committing these crimes, it cuts to kind of the core of what I do. It's not about making ... defendant look bad or

39

look dirty; it's about showing you what ... defendant's values are and what this group is engaged in."

b. *Analysis*.

Defendant contends the prosecutor "vouch[ed] for the credibility of the gang expert and the prosecutor's gang theory of the case." (Boldface & capitalization omitted.) "To preserve a claim of prosecutorial misconduct during argument, [e.g., vouching for witness credibility,] a defendant must contemporaneously object and seek a jury admonition." (*People v. Bonilla* (2007) 41 Cal.4th 313, 336.) "As a general rule a defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion—*and on the same ground*—the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety." (*People v. Samayoa* (1997) 15 Cal.4th 795, 841, italics added.) In the instant case, defendant objected on the basis of "facts not in evidence," which is not the same as improper vouching. (See *People v. Linton* (2013) 56 Cal.4th 1146, 1206–1209.) Consequently, he forfeited his claim on appeal. [Fn.14]

[Fn.14] In any event, even if defendant preserved the vouching claim, it is without merit. The prosecutor "did not place the prestige of the government behind [Beagley] through personal assurances of veracity, or suggest that information not presented to the jury supported [Beagley's] testimony." (*People v. Williams* (2013) 56 Cal.4th 165, 193, overruled in part by *People v. Elizalde* (2015) 61 Cal.4th 523, 538, fn. 9.) Instead, his remarks addressed defense counsel's assertion that gang evidence has no purpose other than mudslinging.

Vasquez, 2018 WL 716845, at *35-36.

a. *Procedural Default*

The state court found that Petitioner had forfeited his claim by failing to object to the prosecutor for improper vouching. Respondent argues that Petitioner's claim is thus procedurally defaulted. The Court agrees.

A federal court will not review a claim of federal constitutional error raised by a state habeas petitioner if the state court determination of the same issue "rests on a state law ground that is independent of the federal question and adequate to support the judgment." Coleman v. Thompson, 501 U.S. 722, 729 (1991). This rule also applies when the state court's determination is based on the petitioner's failure to comply with procedural requirements, so long as the procedural rule is an adequate and independent basis for the denial of relief. Id. at 730. For the bar to be "adequate," it must be "clear, consistently applied, and well-established at the time of the [ ] purported default." Fields v. Calderon, 125 F.3d 757, 762 (9th Cir. 1997). For the bar to be "independent," it must not be "interwoven with the federal law." Michigan v. Long, 463 U.S.

1032, 1040-41 (1983). If an issue is procedurally defaulted, a federal court may not consider it unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice. Coleman, 501 U.S. at 749-50.

The Ninth Circuit has repeatedly held that California's contemporaneous objection doctrine is clear, well-established, has been consistently applied, and is an adequate and independent state procedural rule. Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002); Vansickel v. White, 166 F.3d 953 (9th Cir. 1999). The Ninth Circuit has held that the contemporaneous objection rule also bars a claim of prosecutorial misconduct. Jackson v. Giurbino, 364 F.3d 1002, 1006-07 (9th Cir. 2004); Rich v. Calderon, 187 F.3d 1064, 1070 (9th Cir. 1999). Thus, by failing to object to the prosecutor's alleged improper vouching, Petitioner waived his claim in state court and is procedurally barred from raising it here. In any case, as discussed below, the claim is without merit.

*b. Legal Standard and Analysis*

A petitioner is entitled to habeas corpus relief if the prosecutor's misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974). To constitute a due process violation, the prosecutorial misconduct must be "of sufficient significance to result in the denial of the defendant's right to a fair trial." Greer v. Miller, 485 U.S. 756, 765 (1987) (quoting United States v. Bagley, 473 U.S. 667 (1985)). Any claim of prosecutorial misconduct must be reviewed within the context of the entire trial. Id. at 765-66; United States v. Weitzenhoff, 35 F.3d 1275, 1291 (9th Cir. 1994). The Court must keep in mind that "[t]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor" and "the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused." Smith v. Phillips, 455 U.S. 209, 219 (1982). If prosecutorial misconduct is established, and it was constitutional error, the error must be evaluated pursuant to the harmless error test set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). See Thompson, 74 F.3d at 1577 (Only if constitutional error is established "would we have to decide whether the

41

constitutional error was harmless.”).

The state court reasonably determined that the prosecutor's remarks were not improper, much less misconduct. The prosecutor did not vouch for the expert witness, nor did he place the prestige of the government behind the witness. Rather, the remarks were made in rebuttal to defense counsel's argument that the expert witness testimony was presented solely for the purpose of mudslinging. The prosecutor clarified that this was not the case, and that the purpose of the expert's testimony was to show motive. The state court determination was not unreasonable, and the claim should be rejected.

### 7. Exclusion of Admissible Evidence

Next, Petitioner claims that the trial court deprived him of his due process right to present a complete defense when it excluded the admissible hearsay of Shelly McKeen. Petitioner argues that the evidence had significant probative value for the defense that outweighed any prejudice to the prosecution. Petitioner raised this claim on direct review, and the Fifth DCA denied the claim as follows:

a. *Background*.

Defendant moved in limine to admit, pursuant to Evidence Code section 1370, [Fn.12] a phone conversation between McKeen and Moore recorded on April 14, 2014. The prosecutor opposed the motion. At the hearing on the motion, the court and the parties listened to the recording, which was marked and received into evidence as People's Exhibit No. 5–A. They heard the following exchange:

“Male: Hi, is Shelly there?

“Female: Who's this?

“Male: Detective Moore, police department in Bakersfield.

“Female: Oh, what's up?

“Male: How are you?

“Female: I'm fine. How are you?

“Male: Good.... [¶] ... [¶] ... Um, do you know why I'm calling?

“Female: No.

“Male: Okay, um, your name came up in, uh, in an investigation I'm workin', and I wanted to know if I could, um, talk to you—

42

"Female: Oh, wow.

"Male: And I don't think you're in any trouble I just need to get some, some clarification from you.

"Female: Okay, what's it, what's it dealing with?

"Male: Um, what's your last name Shelly?

"Female: McKeen. [¶] ... [¶]

"Male: Okay. Um, I understand that you know a guy named Aaron.

"Female: Yeah.

"Male: That got shot.

"Female: Yeah, the one's that's been trying to shoot me for the last week, yeah.

"Male: He's trying to what?

"Female: Shoot me.

"Male: Did he say he was gonna shoot you or—

"Female: Numerous times, numerous times. Yeah, numerous times. Yeah, I mean, he's, um, caught me off guard (unintelligible).... [¶] ... [¶] ... [B]ecause like every time, every time he catches me alone he pulls a gun on me, and he forces me to go with him[, which I do because] I'm scared, okay, and then he does whatever he wants. You take it from there.

"Male: When was the last time you seen—

"Female: And so I, and so I run from him.

"Male: The Aaron guy?

"Female: Yeah.

"Male: Okay. When's the, um, last time you saw him?

"Female: Um, (unintelligible), uh, the last time I ran into him was at Del Taco, um two days ago.

"Male: Okay, what's he upset about? [¶] ... [¶]

"Female: Um, okay, because, okay, this is what happened. I'm gonna be straight up and honest with you, you know what I mean. All the things you— I say to you may not like it, but that's okay, you know what I mean? [¶] ... [¶] ... Uh, okay, I went to, um, hung around with Aaron for a couple of days in his black Honda Accord, okay. [¶] ... [¶] ... Well, I had to go see my, my daughter, um, it wasn't very long ago, anyways I told him I had to go see my daughter. [¶] ... [¶] ... Okay, and he's like, well, why don't you just take the car, you know, uh, and he offered it to me. I said, okay, that's cool, you know

43

what I mean? So, and then I, I started (unintelligible) the rest of the day, you know what I mean, and, um, I asked him—I was like seven hours late bringing the car back.

"Male: Yeah.

"Female: Seven hours, right, so I was like, fuck, he's gonna be so mad he's gonna be pissed you know what I mean. [¶] ... [¶] ... So, why don't I just [say], hey, you know what, I'm getting pulled over so I didn't know this car is stolen, right, so I text him. I said, hey, is this car stolen fool 'cause I'm getting pulled over. [¶] ... [¶] ... Okay, and he said, um, why, why what's going on? I said, 'cause I'm getting pulled over is the car stolen? He says yes, and I said, oh, you know what I mean, I wasn't pulled over, but I thought to myself are you sure it is, fool? [¶] ... [¶] ... You let me drive around in this car all day with my daughter, and there's—this is a stolen car and there's guns in here, you know what I mean, that I didn't know about was in there, you know what I'm saying like so I was like, you know what, consider yourself caught fool....

"Male: Can I, can I ask you a question?

"Female: Huh?

"Male: Do have any idea where this car is now?

"Female: Um, I haven't seen that car since, um, I sold it to, uh, Tony.

"Male: Okay. How much did you sell it to Tony for?

"Female: Three-hundred.

"Male: Is that like a deal?

"Female: See Aaron, Aaron is, uh, serious about this car, and I told him, um, you know what I mean, um, when he [got] me at gunpoint the first time—

"Male: Yeah.

"Female: I told him I will take him where I sold the car.

"Male: Yeah.

"Female: And that's how Tony Vasquez got involved because I, um, he went out to Tony's house to get his car back, and, uh, that's why I ran from him.

"Male: Okay.

"Female: So, ever since then, they've been, they've been at it over the car.

"Male: Right.

"Female: 'Cause Tony's not gonna give that car back, and (unintelligible) you know what I mean.

"Male: Yeah. Um—

44

"Female: I've been shot at twice.

"Male: Who's shooting at you?

"Female: It's Aaron and he's busted my—the side of my face with a [ ] [knife,] you know what I mean.

"Male: Yeah.

"Female: He—all—Aaron—it's—he's, he's, he's ignorant that's his problem. He's ignorant.

"Male: Yeah.

"Female: Yeah, okay, and I know that when he finds me it's over, you know what I mean. [¶] ... [¶] ... When he sees me it's over.

"Male: Well, that's why I wanna—can I get involved and talk to you a little bit and get this thing figured out, um, did, did you take any pictures or have any information on this Honda at all like a license plate or a vehicle VIN or anything where I can figure ... [¶] ... [¶] ... out where it came from?

"Female: It doesn't have a VIN on it. Uh, I can get a hold of [unintelligible] was my home girl Nichole on it. She's stole it from somebody, okay. It was her Honda originally, okay, then Aaron beat [the] shit out of her and stole it from her, and then I took it from Aaron [since he lied to me]. [¶] ... [¶] ... And then I went and sold it to Tony. [¶] ... [¶]

"Male: ... Hey, were you there when, uh, when Aaron, when Aaron took that Saturn? ... [¶] ... [¶]

"Female: No. I wasn't there, but I had drove that Saturn, um, and whenever Aaron had caught up with me the second time ... [¶] ... [¶] ... and threw me in the car. [¶] ... [¶] ... Um, he made me drive that car while he went, went and got his Impala. [¶] ... [¶]

"Male: Did, did you ever see, did you ever see Tony driving the Saturn?

"Female: No. I never saw Tony drive it.

"Male: Did you see Tony driving the Honda?

"Female: Um, no, Tony, Tony never drove it, uh, his old lady did.

"Male: Which one?

"Female: Uh, Melissa. That's funny, which one. His wife Melissa.

"Male: When did you see her driving the Honda?

"Female: Uh, the night that I gave him, uh, Tony gave me three-hundred dollars for [it]."

[Fn.12] Evidence Code section 1370, subdivision (a), reads: "Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all

45

of the following conditions are met: [¶] (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant. [¶] (2) The declarant is unavailable as a witness pursuant to [Evidence Code] [s]ection 240. [¶] (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section. [¶] (4) The statement was made under circumstances that would indicate its trustworthiness. [¶] (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official."

Mattson testified she searched for McKeen, but to no avail. Based on McKeen's Facebook posts, Mattson surmised McKeen had moved out of the state.

Moore testified he phoned McKeen on April 14, 2014, after he "received information that she may have some background information regarding the case." As to McKeen's claims of Rocha "shooting at her," "brandishing a gun," and "hitting her," Moore could not find "any information[, e.g., police reports,] that corroborate[d] [her] account of the things that happened to her."

When asked by the court what he "want[ed] to introduce in regard to [the] recording," defense counsel replied:

"Specifically what I'm interested in are the statements from ... McKeen regarding ... Rocha threatening her with—shooting at her, threatening her with a firearm.... [¶] As well as the statement regarding him cutting her face with a knife."

The court commented:

"First, it does appear to me that there has been diligent efforts made, that the definition of unavailable witness under [s]ection 240 of the Evidence Code ... has been met.

"That takes us, then, to [Evidence Code section] 1370.... [¶] ... [T]he definition does appear to have been met and the requirement's met under [Evidence Code section] 1370 based on ... McKeen's statement as to the timing of the events, what the threats were and actions taken. [¶] ... [¶]

"At this point, my tentative thought is to allow the statement to be played in its entirety to the jury should either side wish to do so."

After listening to the parties' arguments concerning whether McKeen's out-of-court statements were admissible under Evidence Code section 1370, the court asked defense counsel to explain the relevance of the statements. Defense counsel answered:

"Rocha's character is going to be in evidence, his character for violence, his character for using firearms. I think the evidence, as it comes out—obviously I can't say exactly what it will be—but I think given the fact that we know that ... Rocha himself had a gun that night, and after the shooting he attempted to hide that gun, if that gun hadn't been used for some illegal purpose or for some nefarious purpose, there would be no reason to hide the gun.

46

"I think the evidence is going to come out that ... Rocha may have either attempted to use that gun or used that gun that night prompting whatever shooting may have occurred afterwards. And I think this would be relevant to his character for violence, his character for using guns, certainly tying him to that gun. And I think it would be relevant for that purpose."

Thereafter, the court tentatively ruled:

"Everyone keep in mind that under [Evidence Code section] 1370, [Evidence Code section] 352 is still the analysis, the ultimate analysis that the Court will perform after going through the first portions. [¶] ... [¶] In regard to ... McKeen, under a[n Evidence Code section] 352 analysis, I'm not referencing undue consumption of time, but whether it's more prejudicial than probative. Under that analysis, I'm not allowing it. [¶] ... [¶] ... [T]hat's my tentative ruling under the [Evidence Code section] 352 analysis. And if we need to revisit it, we can."

Toward the end of the prosecution's case-in-chief, defendant asked the court to admit McKeen's out-of-court statements for the purpose of impeachment. The court rejected the request:

"The ruling is the same. Nothing has substantially changed in regard to my decision-making or my review of the issues or analysis of the issues under any of the concerns, whether it be ... Evidence Code [s]ection 352, et cetera."

b. *Analysis.*

Hearsay statements that are admissible under an exception to the hearsay rule "are nonetheless subject to Evidence Code section 352 under which 'the trial court is required to weigh the evidence's probative value against the dangers of prejudice, confusion, and undue time consumption.' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584.) "A trial court's discretionary ruling under this statute '"must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]"' [Citation.]" (*People v. Williams* (2008) 43 Cal.4th 584, 634–635.) In addition, "when ruling on a[n] [Evidence Code] section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352." (*People v. Williams* (1997) 16 Cal.4th 153, 213.)

At trial, defense counsel argued McKeen's out-of-court statements were relevant to show Rocha provoked the shooting at 7–Eleven. On appeal, defendant alleges Rocha "wait[ed] for [him] to arrive" at 7–Eleven, Rocha "attempted to use [the] firearm to forcibly retake the Honda (an attempted carjacking) when it arrived at the 7–Eleven," and "[Rocha] and Ortiz were shot in self defense." The theory of Rocha being the aggressor, however, found scant support in the record. As noted, the totality of the circumstances indicated defendant was the gunman in the Honda Accord. (See ante, at pp. 44–45.) While the evidence showed Rocha had access to an H & R model 922 .22–caliber nine-shot revolver during and after the shooting, it also showed (1) only three bullets were fired, two of which penetrated Rocha's thigh and Ortiz's temple, respectively; (2) three corresponding Winchester nine-millimeter Luger shell casings were recovered from the crime scene; and (3) none of the shell casings were expelled from the revolver. (Cf. *People v. Viramontes* (2001) 93 Cal.App.4th 1256, 1263 [forensic evidence determined at least one shot

47

was fired from one gun and at least seven shots fired from another gun].) GPS data from defendant's ankle monitor established defendant arrived at 7–Eleven from ampm at precisely 12:16 a.m. 7–Eleven's surveillance footage demonstrated the gunfire commenced at 12:16 a.m. and, a few seconds later, Rodrigo and his girlfriend entered the store and phoned 911. Rodrigo, who had been in the front of the store, heard the gunshots and saw a black car leaving the parking lot. He did not witness anything else that would have corroborated defendant's claim he shot Rocha (and Ortiz, who was sitting in the driver's seat of the Saturn) in self-defense. (Cf. *ibid*. [numerous witnesses described a pause between the first shot and subsequent shots; one witness testified "it sounded as if two different guns were firing from different areas"].) Because the claim was not borne out by the evidence, the court properly excluded evidence of Rocha's bad character as more prejudicial than probative. (See *People v. Hoyos* (2007) 41 Cal.4th 872, 913 ["[E]ven if the ... victim were the most violent person in the world, that fact would not be relevant if the evidence made it clear that the victim was taken by surprise and shot...."], overruled on other grounds by *People v. Black* (2014) 58 Cal.4th 912, 919–920.)

Vasquez, 2018 WL 716845, at *26-30.

### a. *Legal Standard and Analysis*

This claim is not cognizable on federal habeas review because, as previously stated, the admissibility of evidence is a matter of state law. Estelle, 502 U.S. at 67-68 (state evidentiary ruling cannot provide ground for federal habeas relief unless the admission of evidence violated due process). There is no Supreme Court authority that squarely addresses whether a discretionary decision to exclude evidence violates a defendant's constitutional right to present relevant evidence. Moses v. Payne, 555 F.3d 742, 758-59 (9th Cir. 2009); see also Brown v. Horell, 644 F.3d 969, 983 (9th Cir. 2011) ("Between the issuance of Moses and the present, the Supreme Court has not decided any case either 'squarely address[ing]' the discretionary exclusion of evidence and the right to present a complete defense or 'establish[ing] a controlling legal standard' for evaluating such conclusions. Brown, therefore, cannot – as the petitioner in Moses could not – show that the state appellate court's ruling was either contrary to or an unreasonable application of clearly established Supreme Court precedent."). For this reason, Petitioner cannot show that the exclusion of McKeen's statements violated his constitutional rights, and habeas relief is unauthorized. Wright v. Van Patten, 552 U.S. 120, 125-26 (2008).

Moreover, the state court rejection of the claim was entirely reasonable. Petitioner sought to introduce McKeen's statements to show Rocha's propensity for violence to support his allegation that he shot in self-defense. As previously discussed, however, there was little if any

evidence to support this theory. Eyewitness testimony, video surveillance recordings, ballistics evidence, and GPS monitoring data showed that Petitioner arrived at 7-Eleven at 12:16 a.m., that gunfire commenced seconds later from a single gun, and Petitioner then fled the scene on foot. McKeen's testimony would not have altered the outcome. The claim should be rejected.

8. <u>Sentencing Error</u>

Petitioner contends he received an elevated sentence based on facts not found by the jury in violation of his due process rights. Petitioner presented this claim on direct appeal, and it was denied by the Fifth DCA in a reasoned decision as follows:

a. *Background*.

Defendant was charged with the murder of Ortiz on count 1. The information alleged this crime "was done by one of the following means, which is within the meaning of ... section 189. A) Destructive device or explosive [.] B) Weapon of mass destruction[.] C) Armor penetrating ammunition[.] D) Poison[.] E) Lying in wait[.] F) Torture[.] G) Willful, deliberate, and premeditated killing[.] H) Discharge of a firearm from a motor vehicle, intentionally at another person outside the vehicle, with the intent to inflict death[.] I) Perpetration of, or attempt to perpetrate[,] arson, rape, carjacking, robbery, burglary, mayhem, or kidnapping." (Capitalization omitted.) The information further alleged the murder "was intentional and perpetrated by means of discharging a firearm from a motor vehicle at another person or persons with the intent to inflict death, in violation of ... section 190.2[, subdivision]( [a] )(21)." (Capitalization omitted.)

Defendant was also charged with the attempted murder of Rocha on count 2. The information alleged this crime "was done by one of the following means, which is within the meaning of ... section 189. A) Destructive device or explosive [.] B) Weapon of mass destruction[.] C) Armor penetrating ammunition[.] D) Poison[.] E) Lying in wait[.] F) Torture[.] G) Willful, deliberate, and premeditated killing[.] H) Discharge of a firearm from a motor vehicle, intentionally at another person outside the vehicle, with the intent to inflict death[.] I) Perpetration of, or attempt to perpetrate[,] arson, rape, carjacking, robbery, burglary, mayhem, or kidnapping." (Capitalization omitted.)

Prior to closing arguments, the court instructed the jury:

"[CALCRIM No. 520 (First or Second Degree Murder With Malice Aforethought):] [D]efendant is charged in Count 1 with murder, in violation of ... [s]ection 187.

"To prove that ... defendant is guilty of this crime, the People must prove that: [¶] One[,] ... defendant committed an act that caused the death of another person. [¶] And; two, when ... defendant acted, he had a state of mind called malice aforethought. [¶] ... [¶]

"[CALCRIM No. 521 (First Degree Murder):] [D]efendant is guilty of first-degree murder if the People have proved that he murdered by shooting a firearm from a motor vehicle. [¶] ... [D]efendant committed this kind of

49

murder if he shot a firearm from a vehicle; he intentionally shot at a person who was outside ... defendant's vehicle but was occupied; and the third requirement is that he intended to kill that person. [¶] ... [¶]

"[CALCRIM No. 600 (Attempted Murder):] [D]efendant is charged in Count [ ] 2 ... with attempted murder. To prove that ... defendant is guilty of attempted murder, the People must prove that: [¶] One; ... defendant took at least one direct but ineffective step toward killing another person. [¶] And, two; ... defendant intended to kill that person. [¶] ... [¶]

"[CALCRIM No. 601 (Attempted Murder: Deliberation and Premeditation):] If you find ... defendant guilty of attempted murder under Count[ ] 2 ..., you must then decide whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation.

"... [D]efendant acted willfully if he intended to kill when he acted. [¶] ... [D]efendant deliberated if he carefully weighed the considerations for and against his choice and, knowing the consequences, decided to kill. [¶] ... [D]efendant premeditated if he decided to kill before acting. [¶] ... [¶]

"A decision to kill made rashly, impulsively, or without careful consideration of the choice and its consequences is not deliberate and premeditated. On the other hand, a cold, calculated decision to kill can be reached quickly. The test is the extent of the reflection, not the length of time. [¶] ... [¶]

"[CALCRIM No. 700 (Special Circumstances: Introduction):] If you find ... defendant guilty of first-degree murder, you must also decide if the People have proved that the special circumstance is true. [¶] ... [¶]

"[CALCRIM No. 735 (Special Circumstances: Discharge From Vehicle):] [D]efendant is charged with [the] special circumstance of committing murder while shooting a firearm from a motor vehicle, in violation of ... [s]ection 190.2[, subdivision](a)(21).

"To prove that this special circumstance is true, the People must prove that ... defendant shot a firearm from a motor vehicle killing ... Ortiz; ... defendant shot at a person who was outside the vehicle occupied by ... defendant; and, three, at the time of the shooting, ... defendant intended to kill."

Following deliberations, the jury rendered its verdict, which was published by the clerk:

"First count. We, the jury, impaneled to try the above-entitled cause, find ... defendant ... guilty of felony, to wit: [m]urder of ... Ortiz, ... in violation of [s]ection 187[, subdivision](a) ... as alleged in the first count of the Information, and do hereby fix the degree as murder in the first degree....

"We, the jury, impaneled to try the above-entitled cause, find it to be true as to [defendant] that the crime was done by one of the following means, which is within the meaning of ... [s]ection 189[:] (a) destructive device or explosive; (b) weapon of mass destruction; (c) armor-penetrating ammunition; (d) poison; (e) lying in wait; (f) torture; (g) willful, deliberate and premeditated killing; (h) discharge of a firearm from a motor vehicle

50

intentionally at another person outside the vehicle with the intent to inflict death; (i) perpetration of or attempt to perpetrate arson, rape, carjacking, robbery, burglary, mayhem, or kidnapping as alleged in the Information. [¶] ... [¶]

"We, the jury, impaneled to try the above-entitled cause, find it to be true as to [defendant] that the murder of ... Ortiz ... was intentional and perpetrated by means of discharging a firearm from a motor vehicle at another person or persons with the intent to inflict death, in violation of ... [s]ection 190.2[, subdivision](a)(21) as alleged in the Information.... [¶] ... [¶]

"... Second count. We, the jury, impaneled to try the above-entitled cause, find ... defendant ... guilty of felony, to wit: [a]ttempted murder of ... Rocha, in violation of [s]ection[s] 664[ and]187[, subdivision](a) ... as alleged in the second count of the Information....

"We, the jury, impaneled to try the above-entitled cause[,] find it to be true as to [defendant] that the crime was done by one of the following means, which is within the meaning of ... [s]ection 189[:] (a) destructive device or explosive; (b) weapon of mass destruction; (c) armor-penetrating ammunition; (d) poison; (e) lying in wait; (f) torture; (g) willful, deliberate and premeditated killing; (h) discharge of a firearm from a motor vehicle intentionally at another person outside the vehicle with the intent to inflict death; (i) perpetration of or attempt to perpetrate arson, rape, carjacking, robbery, burglary, mayhem[,] or kidnapping as alleged in the Information."

On count 2, the court imposed 14 years to life, plus 25 years to life for firearm discharge proximately causing great bodily injury, five years for the prior serious felony conviction, and two years for two prior prison terms.

       b. *Analysis.*

"[I]f the crime attempted is willful, deliberate, and premeditated murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for life with the possibility of parole. If the crime attempted is any other one in which the maximum sentence is life imprisonment or death, the person guilty of the attempt shall be punished by imprisonment in the state prison for five, seven, or nine years." (§ 664, subd. (a); accord, *People v. Gonzalez* (2012) 54 Cal.4th 643, 654.)

To begin with, defendant questions the format of the accusatory pleading regarding count 2, which (1) alleged attempted murder; and (2) under "enhancement," alleged the crime was done by "one of" several "means" enumerated in section 189. (Capitalization omitted.) The language of section 664, subdivision (a), is unequivocal: an indeterminate term will be imposed only where the crime attempted is willful, deliberate, and premeditated murder. [Fn.15] Nevertheless, while the information should have tailored the allegation on count 2 to assert only willful, deliberate, premeditated attempted murder, it still complied with the statutory pleading requirement. Section 664, subdivision (a), states: "The additional term provided in this section for attempted willful, deliberate, and premeditated murder shall not be imposed unless the fact that the attempted murder was willful, deliberate, and premeditated is charged in the accusatory pleading...." Here, the information identifies "willful, deliberate, and premeditated killing" as "one of" the possible "means" defendant attempted to murder Rocha. (Capitalization omitted.) This is not a scenario in which the pleading omitted the material language. (Cf.

*People v. Arias* (2010) 182 Cal.App.4th 1009, 1017 [charging document alleged defendant unlawfully and with malice aforethought attempted to murder victims but failed to allege these attempted murders were willful, deliberate, and premeditated].) Instead, the information contained the material language and other extraneous points that should not have been listed. Regardless, the information "gave defendant notice that he was potentially subject to the enhanced punishment provision for attempted murder under section 664, subdivision (a)." (*Id*. at p. 1019.)

[Fn.15] The Attorney General contends "the 'willful, deliberate, and premeditated' language in section 664 should be read to include all forms of first degree murder listed in section 189." Defendant disagrees, as do we. "The court's role in construing a statute is to 'ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citations.] In determining the Legislature's intent, a court looks first to the words of the statute. [Citation.] '[I]t is the language of the statute itself that has successfully braved the legislative gauntlet.' [Citation.]" (*People v. Snook* (1997) 16 Cal.4th 1210, 1215.) "When looking to the words of the statute, a court gives the language its usual, ordinary meaning. [Citations.] If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs. [Citations.]" (*Ibid*.)

Next, defendant argues:

"The jury verdict form for Count 2 asked jurors to make a special finding pursuant to ... section 189. The verdict form did not ask the jury to identify which factor the jury relied upon. Instead, it simply listed the nine different ways that a murder can be elevated to first degree murder ... and asked the jury to find that the attempted murder 'was done by one of [those] means.' Thus, the jury's 'true' finding only indicates that the attempted murder was done by one of the nine ways listed on the jury verdict form. There was no specific finding that the attempted murder was 'willful, deliberate, and premeditated murder, as defined in Section 189.'"

We agree nothing on the face of the form indicated which of the nine means formed the basis of the "true" finding. However, to the extent defendant suggests section 664, subdivision (a), requires an express finding in the verdict that he attempted willful, deliberate, and premeditated murder, we disagree in view of the plain meaning of the provision. (See, e.g., *People v. Chevalier* (1997) 60 Cal.App.4th 507, 515 [similar to the language in § 664, subd. (a), Health & Saf. Code, § 11370.4, subd. (c) provides that the weight enhancement shall not be imposed unless it "is charged in the accusatory pleading and admitted or found to be true by the trier of fact"; an express finding by the jury in the verdict of the weight enhancement is not required because the statute does not state that an express finding is required].) Moreover, under the circumstances of this particular case, a finding of willful, deliberate, and premeditated attempted murder was discernible.

""""A verdict is to be given a reasonable intendment and be construed in light of the issues submitted to the jury and the instructions of the court." [Citations.]' [Citations.] 'The form of a verdict is immaterial provided the intention to convict of the crime charged is unmistakably expressed. [Citation.]' [Citation.] '[T]echnical defects in a verdict may be disregarded if the jury's intent to convict of a specified offense within the charges is unmistakably clear, and the accused's substantial rights suffered no prejudice. [Citations.]' [Citation.]" (*People v. Jones* (1997) 58 Cal.App.4th 693, 710–711; see *People v. Arredondo* (1975) 52 Cal.App.3d 973, 978 ["The cases equate 'substantial rights' with reversible error, i.e., did the error result

in a miscarriage of justice?"]; see also *People v. Watson, supra*, 46 Cal.2d at p. 836 ["[A] 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error."].) "The same rules apply to a finding on a sentence enhancement allegation." (*People v. Chevalier, supra*, 60 Cal.App.4th at p. 514.)

As noted, in connection with count 2, the court specifically instructed the jury to decide "whether the People have proved the additional allegation that the attempted murder was done willfully, and with deliberation and premeditation." It did not give analogous instructions concerning attempted murder perpetrated in the commission of arson, rape, carjacking, robbery, burglary, mayhem, or kidnapping or perpetrated by means of a destructive device or explosive, a weapon of mass destruction, armor-penetrating ammunition, poison, lying in wait, torture, or discharging a firearm from a motor vehicle. Defendant recognizes "CALCRIM No. 601 [the instruction on deliberation and premeditation] only applied to the 'deliberation and premeditation' alternative mentioned in the pleadings" and "did not purport to define the other ... ways that were alleged in the pleading ... to elevate attempted murder to an aggravated offense." Because the instruction "framed the pertinent issue" (*People v. Mackabee* (1989) 214 Cal.App.3d 1250, 1256), the "true" finding on the verdict form could only refer to the jury's determination as to whether defendant's attempted murder of Rocha was willful, deliberate, and premeditated. (See *People v. Sanchez* (2001) 26 Cal.4th 834, 852 ["Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions."]; see also *People v. Mackabee, supra*, at pp. 1256–1257 ["[T]he jury instructions were sent into the jury room during deliberations[;] the information was not. It is therefore reasonable to assume the jury paid more attention to the instructions than to the information."].)

Defendant insists the jury's finding of aggravated attempted murder could have been (and was likely) based on shooting a firearm from a motor vehicle. We disagree. The court's instructions on count 2 only referred to willful, deliberate, and premeditated attempted murder. The instructions on shooting from a motor vehicle were given in connection with count 1, not count 2. Absent affirmative evidence to the contrary, it must be presumed the jury complied with the instructions given to it. (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1370; *People v. Crow* (1994) 28 Cal.App.4th 440, 446; accord, *Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803.)

In addition, defendant's substantial rights suffered no prejudice. The proof of willful, deliberate, and premeditated attempted murder was overwhelming. The record establishes defendant was aware Rocha took a silver two-door Saturn from defendant's residence. (See *People v. Brooks, supra*, 3 Cal.5th at pp. 58–59 [jury could reasonably infer motive to kill from evidence of a defendant's prior relationship with the victim].) On the night of the shooting, Rocha parked the Saturn at a 7–Eleven at approximately 12:11 a.m. Defendant, who had been at a different convenience store since 12:02 a.m., went to the 7–Eleven. (Cf. *People v. Koontz* (2002) 27 Cal.4th 1041, 1081 [defendant pursued victim from one apartment to another].) Defendant was armed with a loaded handgun, "indicating he had considered the possibility of a violent encounter." (*People v. Lee, supra*, 51 Cal.4th at p. 636.) Defendant arrived at 7–Eleven in the Honda Accord at precisely 12:16 a.m. He snuck up behind the Saturn, in which Rocha was essentially confined (see *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237 [total vulnerability of the victim]) and immediately fired three shots at close range (see, e.g., *People v. Manriquez,*

*supra*, 37 Cal.4th at p. 578; *People v. Koontz, supra*, at p. 1082). "[T]he manner of killing [and attempted killing] was calm and exacting, supporting a conclusion that it was the result of preexisting thought and reflection rather than an unconsidered rash impulse." (*People v. Lee, supra*, at p. 637.)

Finally, regarding defendant's claim of *Apprendi* [Fn.16] error, we point out, in the cases cited by defendant in support of the claim, the trial judge enhanced a prison sentence after he (not the jury) made the requisite factual determination. (See *Washington v. Recuenco* (2006) 548 U.S. 212, 214–215; *Apprendi, supra*, 530 U.S. at pp. 468–469; see also *Blakely v. Washington* (2004) 542 U.S. 296, 298; *Ring v. Arizona* (2002) 536 U.S. 584, 588–589.) By contrast, in the instant case, the issue of whether defendant willfully, deliberately, and with premeditation attempted to murder Rocha was submitted to the jury and an affirmative finding was inferable from the record. Even assuming, arguendo, there was an error, it was harmless beyond a reasonable doubt because there was overwhelming evidence of planning, motive, and manner of killing, all of which may establish premeditation and deliberation. (*People v. Jablonski* (2006) 37 Cal.4th 774, 817.)

[Fn.16] *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 (*Apprendi*).

Vasquez, 2018 WL 716845, at *36-40.

### a. *Legal Standard and Analysis*

It is well-settled that federal habeas relief is not available to state prisoners challenging state law. Estelle, 502 U.S. at 67 (1991) ("We have stated many times that federal habeas corpus relief does not lie for errors of state law"); Langford v. Day, 110 F.3d 1380, 1389 (9th Cir. 1997) ("alleged errors in the application of state law are not cognizable in federal habeas corpus" proceedings). Thus, to the extent Petitioner disagrees with the state court's determination that the accusatory pleading complied with state notice requirements, he fails to present a federal question. Likewise, his disagreement with the state court determination that Cal. Penal Code § 664(a) does not require an express finding that he attempted willful, deliberate, and premeditated murder fails to present a federal claim.

Petitioner also contends that his sentence violates Apprendi. In Apprendi v. New Jersey, 530 U.S. 466, 488-90 (2000), the Supreme Court held that "any fact [other than a the fact of a prior conviction] that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Petitioner states that because Cal. Penal Code § 664(a) increases the penalty for attempted murder if it is premeditated, the question of premeditation must be submitted to the jury. The state court reasonably determined that Apprendi was not violated because the issue of premeditation was in fact

54

submitted to the jury. The state court also reasonably determined that even if Apprendi error occurred, it was harmless beyond a reasonable doubt, because there was overwhelming evidence of planning, motive and manner of killing sufficient to establish premeditation and deliberation. The claim should be denied.

### 9. Insufficiency of the Evidence

Petitioner contends that there was insufficient evidence to support the conviction for making criminal threats. Petitioner raised this claim on direct review, and it was denied in a reasoned decision as follows:

> "Claims challenging the sufficiency of the evidence to uphold a judgment are generally reviewed under the substantial evidence standard. Under that standard, "'an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt.'" [Citations.]" (*In re George T.* (2004) 33 Cal.4th 620, 630–631.) We "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." (*People v. Redmond* (1969) 71 Cal.2d 745, 755.) "We need not be convinced of the defendant's guilt beyond a reasonable doubt; we merely ask whether "'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.]' [Citation.]" (*People v. Tripp* (2007) 151 Cal.App.4th 951, 955, italics omitted.)

> "Before the judgment of the trial court can be set aside for insufficiency of the evidence to support the verdict of the jury, it must clearly appear that upon no hypothesis what[so]ever is there sufficient substantial evidence to support it." (*People v. Redmond, supra*, 71 Cal.2d at p. 755.) "'Conflicts and even testimony which is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.' [Citation.]" (*People v. Lee* (2011) 51 Cal.4th 620, 632.)

> "This standard of review ... applies to circumstantial evidence. [Citation.] If the circumstances, plus all the logical inferences the jury might have drawn from them, reasonably justify the jury's findings, our opinion that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citations.]" (*People v. Tripp, supra*, 151 Cal.App.4th at p. 955.)

> "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in a sustained

55

fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*People v. Toledo* (2001) 26 Cal.4th 221, 227–228.)

Substantial evidence derived from People's Exhibit No. 9–A supported defendant's conviction for criminal threats. He and Dunn were alone in a moving vehicle at nighttime. It is reasonable to deduce defendant was driving and in control of the vehicle, i.e., he was able to keep the doors locked, judging from Dunn's later pleas to "[l]et [her] out," inter alia. (See *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348 [the defendant's proximity to victim adds weight to purported threat].) With access to a knife, he told Dunn to "accept" her "punishment" for her failure to steal for him "[t]wo days in a row," a failure he equated with "[s]traight utter disrespectfulness." (Cf. *ibid.* [the defendant made a willful threat to inflict death or great bodily injury when he displayed a weapon and told the victim he would kill him].) Clearly distressed, Dunn begged him not to "hurt" or "stab" her and offered to "do anything," including prostitution, to redeem herself and avoid physical harm. Unmoved by her pleas and tears, defendant told Dunn she was "gonna get it, regardless," explaining (1) she had to "suffer the consequences" for not "follow[ing] rules"; and (2) if he "let [her] get away with this," "then the next one's gonna wanna get away with it." (See *People v. Wilson* (2010) 186 Cal.App.4th 789, 806 ["[T]he defendant must intend for the victim to receive and understand the threat...."].) As the footage demonstrated, Dunn was in fear for her own safety "beyond [a] momentary, fleeting, or transitory" period (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156), a fear which manifested in frenzied screaming when defendant made a sudden movement and said, "I want you to fuckin' die." Based on the overall circumstances, a reasonable jury could have found defendant's statements were "'sufficiently unequivocal, unconditional, immediate, and specific as to convey to the victim a gravity of purpose and immediate prospect of execution'" (*People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1433, italics omitted) and Dunn's sustained fear was reasonable (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1140). Even assuming, arguendo, defendant may not have intended to stab or otherwise inflict physical damage on Dunn, a "[s]pecific intent to carry out the threatened crime is not required." (*People v. Butler* (2000) 85 Cal.App.4th 745, 759.) [Footnote omitted.]

<u>Vasquez</u>, 2018 WL 716845, at *31.

        a.    *<u>Legal Standard</u>*

The law on sufficiency of the evidence is clearly established by the United States Supreme Court. Pursuant to the United States Supreme Court's holding in <u>Jackson v. Virginia</u>, 443 U.S. 307, the test on habeas review to determine whether a factual finding is fairly supported by the record is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson</u>, 443 U.S. at 319; see also <u>Lewis v. Jeffers</u>, 497 U.S. 764, 781 (1990). Thus, only if "no rational trier of fact" could have found proof of guilt beyond a reasonable doubt will a petitioner be entitled to habeas relief. <u>Jackson</u>, 443 U.S. at 324. Sufficiency claims are judged by

56

the elements defined by state law.  Id. at 324, n. 16.

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume–even if it does not affirmatively appear in the record–that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Id. at 326. Circumstantial evidence and inferences drawn from that evidence may be sufficient to sustain a conviction.  Walters v. Maass, 45 F.3d 1355, 1358 (9th Cir. 1995).

After the enactment of the AEDPA, a federal habeas court must apply the standards of Jackson with an additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).  In applying the AEDPA's deferential standard of review, this Court must presume the correctness of the state court's factual findings.  28 U.S.C. § 2254(e)(1); Kuhlmann v. Wilson, 477 U.S. 436, 459 (1986).

In Cavazos v. Smith, 565 U.S. 1 (2011), the United States Supreme Court further explained the highly deferential standard of review in habeas proceedings, by noting that Jackson

> makes clear that it is the responsibility of the jury - not the court - to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."
>
> Because rational people can sometimes disagree, the inevitable consequence of this settled law is that judges will sometimes encounter convictions that they believe to be mistaken, but that they must nonetheless uphold.

Id. at 2.

b.    *Analysis*

A federal habeas court determines sufficiency of the evidence in reference to the substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at 324 n. 16. Petitioner was convicted of violating California Penal Code § 422. That section states:

> Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby

57

causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment in the county jail not to exceed one year, or by imprisonment in the state prison.

Cal. Penal Code § 422(a).

Thus, to be found guilty of this crime, the prosecution must prove five distinct elements:

(1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement ... is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat—which may be 'made verbally, in writing, or by means of an electronic communication device'—was 'on its face and under the circumstances in which it [was] made, ... so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances.

People v. Toledo, 26 Cal.4th 221, 227-28 (2001) (quoting People v. Bolin, 18 Cal.4th 297, 337-340 & fn. 13 (1998).

Viewing the evidence in the light most favorable to the prosecution, it is clear that the state court's determination that there was sufficient evidence was not unreasonable. As noted by the state court, Petitioner made several statements which reasonably could have been construed as a threat of death or great bodily injury. While holding a knife, Petitioner told the victim "this is your . . . punishment." (Doc. 19-5 at 15.) When the victim pleaded with him not to "hurt" or "stab" her, he told her she could "cry all you want," but she was "gonna get it, regardless," because she had to "suffer the consequences." (Doc. 19-5 at 6-10.) Subsequently, when the victim pleaded that she would do anything for him and asked him what he wanted of her, he made a sudden movement and said, "I want you to fuckin' die," at which point the victim screamed in terror. (Doc. 19-5 at 14.) From this evidence, a jury could conclude that the requirements of Cal. Penal Code § 422(a) were met.

In light of the above, Petitioner fails to show that no rational trier of fact would have agreed with the state court's determination. Petitioner fails to demonstrate that the state court rejection of his claim was contrary to, or an unreasonable application of, the Jackson standard.

Further, the state court reasonably rejected Petitioner's claim that his threats were

58

protected speech under the First Amendment. The California courts have rejected contentions that Cal. Penal Code § 422 violates the First Amendment. Toledo, 26 Cal.4th at 233 (Section 422 is not unconstitutionally overbroad). Petitioner concedes that a "true threat" is not protected speech under the First Amendment. See Virginia v. Black, 538 U.S. 343, 359 (2003). Nevertheless, he alleges his words fell short of constituting a true threat. For the same reasons stated above, his arguments fail. A rational jurist could determine that Petitioner's words could, and in fact did, cause the victim to believe she would be subjected to great bodily injury or death. The claim should be denied.

### 10. Cumulative Error

In his final claim for relief, Petitioner alleges that the cumulative effect of the errors deprived him of due process. Petitioner also raised this claim on direct appeal to the Fifth DCA, which denied the claim in the last reasoned decision as follows:

> "[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error." (*People v. Hill* (1998) 17 Cal.4th 800, 844.) "A claim of cumulative error is in essence a due process claim...." (*People v. Rivas* (2013) 214 Cal.App.4th 1410, 1436.) "'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'" (*Ibid.*) "[T]he reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.'" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.)

> Having reviewed and analyzed each alleged error, we cannot conclude the cumulative effect was such that defendant was deprived of due process and a fair trial.

Vasquez, 2018 WL 716845, at *42.

### a. Legal Standard and Analysis

"Multiple errors, even if harmless individually, may entitle a petitioner to habeas relief if their cumulative effect prejudiced the defendant." Ceja v. Stewart, 97 F. 3d 1246, 1254 (9th Cir. 1996) (citing Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992)); see also Karis v. Calderon, 283 F.3d 1117, 1132 (9th Cir. 2002). However, the Ninth Circuit has also recognized that where there is no single constitutional error, nothing can accumulate to the level of a constitutional violation. See Rup v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996). In this case, no errors occurred, and hence, there can be no cumulative error. Even if errors occurred, a reasonable factfinder

could have found that the cumulative effect of the alleged errors did not prejudice Petitioner.

**IV.     RECOMMENDATION**

Accordingly, the Court RECOMMENDS that the Petition for Writ of Habeas Corpus be DENIED with prejudice on the merits.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy of this Findings and Recommendation, any party may file written objections with the Court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the Objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the Objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the Order of the District Court.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **December 16, 2019**                          /s/ *Sheila K. Oberto*
                                                        UNITED STATES MAGISTRATE JUDGE